# IN THE COURT OF APPEALS OF TENNESSEE
# MIDDLE SECTION AT NASHVILLE

**FILED**

**August 7, 1996**

**Cecil W. Crowson**
**Appellate Court Clerk**

MICHAEL ANTHONY LADD,  )
a minor, by VIRGINIA LADD,  )
as next friend and legal guardian, )
           )
  Plaintiff/Appellant,  )
           )
           )
VS.         )  Sumner Circuit
           )  No. 9605-C
           )
HONDA MOTOR CO., LTD.;  )  Appeal No.
HONDA R & D CO., LTD.;  )  01-A-01-9503-CV-00091
AMERICAN HONDA MOTOR CO., )
INC.; BOWLING GREEN CYCLES, )
INC.; and ERBY L. GIVENS,  )
           )
  Defendants/Appellees.  )

APPEAL FROM THE CIRCUIT COURT FOR SUMNER COUNTY
AT GALLATIN, TENNESSEE

THE HONORABLE THOMAS GOODALL, JUDGE

For the Plaintiff/Appellant:    For the Defendants/Appellees:

Joe Bednarz         Linda J. Hamilton
Mowles
Nashville, Tennessee      R. Dale Bay
             Lewis, King, Krieg & Waldrop
             Knoxville, Tennessee

# REVERSED AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# **O P I N I O N**

This appeal involves a twelve-year-old boy who became paralyzed when he lost control of an all-terrain vehicle and crashed into a utility pole. The boy sued the manufacturer of the all-terrain vehicle in the Circuit Court for Sumner County, alleging that its advertisements falsely and misleadingly depicted all-terrain vehicles as safe enough to be operated by children. The jury returned a verdict for the manufacturer following a lengthy trial, and the child and his mother appealed. We have determined that the trial court's instructions did not fairly appraise the jury of the plaintiff's theory of the case and that its supplemental instructions confused the jury about the significance of their verdict. Therefore, we reverse the judgment and remand the case for a new trial.

## **I.**

Erby Givens purchased a four-wheeled Honda all-terrain vehicle Model TRX 250 in January 1986. Approximately four months later, he drove his "four-wheeler" to Earl and Virginia Ladd's apartment in the Portland Housing Authority complex. During his visit, Mr. Givens permitted the Ladds' twelve-year-old son, Michael, to drive the all-terrain vehicle. He had permitted the boy to drive the all-terrain vehicle in the past, and he believed that children could safely operate it because he had seen Honda's advertisements showing children driving all-terrain vehicles.

Michael Ladd began driving the all-terrain vehicle on the street in front of the housing complex. After several hours, he and a passenger began driving the vehicle on a grassy area behind his parents' apartment. While Michael Ladd had adult supervision during the early part of the day, his parents and Mr. Givens became involved with other activities as the afternoon wore on. Mr. Givens and Mr. Ladd were drinking beer on the Ladds' front porch, and Ms. Ladd was babysitting her granddaughter inside the Ladds' apartment.

Michael Ladd drove the all-terrain vehicle on the grassy area behind his parents' apartment all afternoon. At approximately 5:30 p.m., he and a twelve-

year-old passenger hit a two-foot wide dish-shaped depression in the ground. Michael Ladd lost control, and the all-terrain vehicle crashed into a utility pole. The passenger was thrown from the vehicle without serious injury, but Michael Ladd hit the utility pole head-on. His injuries have rendered him a paraplegic.

In May 1991, Michael Ladd filed suit in the Circuit Court for Sumner County against Honda Motor Co., Ltd., Honda Research and Development, Ltd., Honda R&D North America, Inc., American Honda Motor Company, Inc., Mr. Givens, and the dealership that sold the four-wheeler to Mr. Givens. With regard to the four Honda defendants, the complaint alleged: (1) that the 1986 Honda TRX 250 all-terrain vehicle was defective or unreasonably dangerous, (2) that the safety warnings for the vehicle were inadequate, (3) that the Honda defendants had misrepresented the characteristics of all-terrain vehicles, and (4) that the design, manufacture, testing, or inspection of the 1986 Honda TRX 250 all-terrain vehicle was negligent.[1]

The trial began in March 1993 and lasted five weeks. On the third day of deliberations, the jury reported that it could not reach a decision with regard to the misrepresentation claims. The trial judge gave the jury additional instructions and urged them to answer as many of the questions on the special verdict form as they could. The jury completed the special verdict form within one hour and answered all questions in favor of the Honda defendants. Michael Ladd filed two timely motions for new trial. The trial court initially denied the motions but later reversed itself because it believed it had given an improper dynamite charge. The Honda defendants sought and obtained an interlocutory appeal with regard to this decision.

On May 13, 1994, this court filed an opinion concluding that the trial court had not given the jury a dynamite charge and, therefore, that the trial court had erroneously granted the new trial. Since the trial court had not acted on the other grounds stated in the motion for new trial, this court vacated the order granting the new trial and remanded the case with directions that the trial court consider and

_____

[1]The complaint alleged negligence claims against Mr. Givens and the dealership that sold him the all-terrain vehicle. This appeal concerns only the claims against the Honda defendants.

act upon these other grounds. *Ladd v. Honda Motor Co.,* App. No. 01-A-01-9309-CV-00399, slip op. at 9-10 (Tenn. Ct. App. May 13, 1994), *perm. app. denied concurring in results only* (Tenn. Sept. 26, 1994).

The trial court denied the remaining grounds of the motion for new trial in July 1994 before the Tennessee Supreme Court had disposed of Michael Ladd's application for permission to appeal. In October 1994, after the Tennessee Supreme Court denied Michael Ladd's application for permission to appeal, the trial court entered a final order approving the jury's verdict as thirteenth juror, denying the first and second motions for new trial, and taxing the costs to Michael Ladd. This appeal ensued.

## II.
### THE SCOPE OF THE APPEAL

We turn first to the scope of this appeal. Since this is the second appeal in this case, Michael Ladd cannot reargue issues that have already been heard and decided. Several of the issues he has raised on this appeal were either directly or implicitly decided on the first appeal and, therefore, will not be considered now.

### A.

Michael Ladd filed two timely post-trial motions containing eighteen grounds for a new trial.[2] Eight of these grounds related to the trial court's instructions and comments to the jury, including the supplemental instructions given after the jury reported it was deadlocked. The trial court first denied the motions for new trial, observing that the appellate courts "will certainly have a great deal to chew on." During a later hearing concerning the wording of its final order, the trial court announced that it had changed its mind and had decided to grant Michael Ladd a new trial. The decision was based solely on the trial court's belief that it had given an improper dynamite charge when the jury announced it was deadlocked.

---

[2]The motions actually contain twenty grounds; however, two of the grounds in the second motion for new trial duplicate grounds contained in the first motion for new trial.

Both the trial court and this court granted the Honda defendants permission to perfect an interlocutory appeal to determine whether the trial court's supplemental instructions amounted to "an improper 'dynamite charge' which may have improperly influenced the jury." In this court, the Honda defendants insisted that the only issue to be decided was whether the trial court used a dynamite charge to coerce the jury to return a verdict. Michael Ladd, on the other hand, argued that the court could consider the broader issue of whether there was any ground for granting him a new trial. This court determined that the trial court had not used an inappropriate dynamite charge and accordingly vacated the order granting the motion for new trial. *Ladd v. Honda Motor Co., supra,* slip op. at 9. We also remanded the case with directions that the trial court consider and rule on the other grounds asserted in the motions for new trial. *Ladd v. Honda Motor Co., supra,* slip op. at 10.

The trial court thereafter approved the verdict as thirteenth juror and denied both of Michael Ladd's motions for new trial on all grounds. The trial court stayed its order while the Tennessee Supreme Court considered whether it would review this court's decision. After the Court declined to review the case, the trial court entered a final order again denying both motions for new trial on all grounds.

**B.**

The law of the case doctrine is a discretionary rule of practice that promotes judicial economy and consistency and also protects litigants from the burdens of repeatedly rearguing issues that have been decided. 18 Charles A. Wright et al., *Federal Practice and Procedure* § 4478, at 788-90 (1981). It is not a limitation on a court's power like the doctrine of res judicata, but rather it is a common sense recognition that issues ordinarily need not be revisited once they have been litigated and decided. *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S. Ct. 739, 740 (1912); *Mendenhall v. Barber-Greene Co.,* 26 F.3d 1573, 1582 (Fed. Cir.), *cert. denied,* 115 S. Ct. 582 (1994).

Under the law of the case doctrine, an appellate court's decision on an issue of law becomes binding precedent to be followed in later trials and appeals of the same case involving the same issues and facts. *Jones v. Jones,* 784 S.W.2d 349, 351 n.1 (Tenn. Ct. App. 1989); *Cook v. McCullough,* 735 S.W.2d 464, 470-71 (Tenn. Ct. App. 1987) (quoting *Holcomb v. McClure*, 64 So. 2d 689, 691 (Miss. 1953)); 1B James W. Moore & Jo Desha Lucas, *Moore's Federal Practice* ¶ 0.404[1] (2d ed. 1995). The doctrine applies to issues that were actually before the court, *Barnes v. Walker,* 191 Tenn. 364, 374, 234 S.W.2d 648, 652 (1950), or to issues that were necessarily decided by implication. 18 Wright et al., *supra,* § 4478, at 789. It does not apply to dicta. *Ridley v. Haiman,* 164 Tenn. 239, 248-49, 47 S.W.2d 750, 752-53 (1932); *Schoen v. J.C. Bradford & Co.,* 667 S.W.2d 97, 101 (Tenn. Ct. App. 1984). Thus, taking an interlocutory appeal does not preclude a later appeal from the final judgment, but the decision of the appellate courts on the interlocutory appeal constitutes the law of the case with regard to the issues raised and decided on the interlocutory appeal. 1B Moore et al., *supra,* ¶ 0.404[4.-7], at II-36 to II-37.

The application of the law of the case doctrine to intermediate appellate court opinions does not necessarily depend upon whether the opinion has been reviewed by the Tennessee Supreme Court. The doctrine has been applied to decisions that have not been reviewed by the Supreme Court, *Bivins v. Hospital Corp. of Am.,* 910 S.W.2d 441, 447 (Tenn. Ct. App. 1995), as well as to decisions that the Supreme Court has declined to review. *Life & Casualty Ins. Co. v. Jett,* 175 Tenn. 295, 299, 133 S.W.2d 997, 998-99 (1939); *State ex rel. Kirkpatrick v. Tipton,* 670 S.W.2d 224, 226 & n.5 (Tenn. Ct. App. 1984); *S.M.R. Enters. v. Southern Haircutters, Inc.,* 662 S.W.2d 944, 950 (Tenn. Ct. App. 1983). Obviously, it does not apply to intermediate appellate court opinions that have been reversed or vacated. While some question exists with regard to its application to intermediate appellate court decisions that the Supreme Court has declined to review "concurring in results only,"[3] we conclude that the doctrine applies to these cases because the decision to concur only with the results of an opinion simply "evinces . . . [the] Court's judgment that the opinion of the . . . [intermediate appellate court] should not be published." *Pairamore v. Pairamore,*

---

[3] *Clingan v. Vulcan Life Ins. Co.,* 694 S.W.2d 327, 331 (Tenn. Ct. App. 1985).

547 S.W.2d 545, 548 (Tenn. 1977).[4] These decisions still have precedential value with regard to the parties involved in the case. *Patton v. McHone,* 822 S.W.2d 608, 615 n.10 (Tenn. Ct. App. 1991).

## C.

This court's decision in the earlier interlocutory appeal in this case has become the law of the case with regard to four of Michael Ladd's issues on this appeal. First, this court has squarely decided that the trial court's supplemental instructions did not amount to a dynamite charge that improperly coerced the jury into returning a verdict for the defendants. Second, this court expressly concurred with the trial court's conclusion that an interlocutory appeal from its decision to grant a new trial was warranted. Third, this court, not the trial court, ultimately decided what the scope of the interlocutory appeal would be and also which standard of review we would apply. Thus, the trial court's decisions with regard

---

[4]Few appellate dispositions have caused more confusion among the bench and bar than the Tennessee Supreme Court's practice of declining to review an intermediate appellate court's opinion "concurring in results only." One justice has characterized the practice as "patently unfair" because it leaves the intermediate appellate courts, the trial courts, and the litigants to speculate about the reasons for the Court's action. *Pairamore v. Pairamore,* 547 S.W.2d at 552 (Henry, J., dissenting).

The Tennessee Supreme Court has never satisfactorily explained the difference between the "d.c.r.o." disposition and a simple denial of an application for permission to appeal. When the Court denies an application for permission to appeal "concurring in results only," it is obviously concurring only in the opinion's results, not necessarily its reasoning. However, the Court has never held that the simple denial of an application for permission to appeal amounts to an endorsement of both the reasoning and the results of the intermediate appellate court's opinion. While it has pointed out that the denial of a Tenn. R. App. P. 11 application, without more, "emphasizes the concurrence of the Court in the opinion of the . . . [intermediate appellate court]," *Beard v. Beard,* 158 Tenn. 437, 442, 14 S.W.2d 745, 747 (1929), it has also explained that it is primarily concerned with the results reached, *Adams v. State,* 547 S.W.2d 553, 556 (Tenn. 1977); *Bryan v. Aetna Life Ins. Co.,* 174 Tenn. 602, 611, 130 S.W.2d 85, 88 (1939), and that the simple denial of an application for permission to appeal does not commit the Court to all the views expressed in the particular intermediate appellate court opinion. *Swift v. Kirby,* 737 S.W.2d 271, 277 (Tenn. 1987); *Street v. Calvert,* 541 S.W.2d 576, 587 (Tenn. 1976). Thus, it would appear that the Court's simple denial of an application for permission to appeal does not have any greater jurisprudential significance than a denial "concurring in results only."

Thus, the distinction between a "d.c.r.o." disposition and the simple denial of an application for permission to appeal is extremely subtle. On the face of things, the Court appears to be engaging in a result-oriented analysis in both circumstances and is not necessarily agreeing with the intermediate appellate court's reasoning when it simply denies the Tenn. R. App. P. 11 application. A better understanding of the two dispositions will only come when the Court provides a clearer explanation of the differences between them.

to the latter two points had no practical effect on the direction or scope of the interlocutory proceedings.

This court also decided a fourth issue by necessary implication. By determining that the trial court's supplemental instructions were not inappropriately coercive and that the trial court erred by granting a new trial, we necessarily decided that the trial court did not err by giving supplemental instructions instead of declaring a mistrial. We would not have addressed the substance of the supplemental instructions had we concluded that no supplemental instructions should have been given. Thus, our decision that the supplemental instructions did not amount to an inappropriate dynamite charge necessarily rested on our conclusion that the trial court did not err by giving these instructions rather than declaring a mistrial.

This court addressed these four issues directly or by necessary implication when we granted and decided the earlier interlocutory appeal in this case. Our decisions on these issues have not been reversed or vacated by the Tennessee Supreme Court[5] and, therefore, have become the law of the case. Accordingly, we will not revisit these issues on this appeal.

## III.

### THE REQUEST FOR AN ADVISORY VERDICT

We now turn to the trial court's supplemental instructions after the foreperson announced that the jury was deadlocked. The trial court apparently decided that the case would have to be tried again and exhorted the jury to return an advisory verdict that would be helpful to the court and the parties. We have determined that this instruction was contrary to established law and that it confused the jury with regard to their function. Accordingly, it undermined the validity of the jury's verdict.

_____

[5]While the court may have been dissatisfied with some portion of the reasoning in our earlier opinion, it left our conclusion that the trial court had not given an improper dynamite charge in tact. Presumably the Court would not have permitted our decision to stand if we had reached the wrong result. The Court alluded to our decision in a later case without criticism. *See Johnson v. Hardin,* App. No. 01-S-01-9510-CV-00188, slip op. at 13 n.8 (Tenn. July 15, 1996) (Opinion designated "For Publication").

## A.

The jury encountered difficulties almost as soon as they began deliberating. During the first two days of deliberations, the jury requested four clarifications of different portions of the instructions and the questions on the special verdict form. On the third day, after the jury had deliberated for over fifteen hours, the foreperson passed a note to the trial court stating: "We cannot come to a unanamous [sic] decision. We have tried very hard but on one question we simply cannot agree.[6] We feel that we all have followed our own convictions."

The trial court called the jury into the courtroom in response to the note and asked the foreperson whether the jury had agreed on the answers to the questions on the special verdict form other than those relating to the misrepresentation claims. After the foreperson announced that the jury had been able to answer the other questions, the trial court instructed the jury

> to go back and fill out what you can. Now, you must remember, I doubt that I have instructed you on this, I will look it over to be certain there is not any inconsistent verdict, I'll review that. . . . Those things that you have agreed on, go on and fill that [the verdict form] out, sign it, come back and let me look at that.

The jury returned approximately twenty minutes later with a partially completed verdict form. The trial court repeated the portions of its original charge concerning the requirement of a unanimous verdict, the duty of jurors to consult with each other during deliberations, and the jurors' obligation not to surrender their honest convictions. The trial court also stated that it would discuss the possibility of giving additional instructions with the lawyers and then asked each juror whether "an expanded definition" of the portion of the instructions relating to Michael Ladd's misrepresentation claim would be helpful. Five of the seven jurors responded that they doubted that additional instructions would be helpful.

---

[6]The note contained a reference to the portion of the special verdict form containing the questions relating to Michael Ladd's misrepresentation claims. Accordingly, the trial court and the parties concluded that the jury had not been able to reach a unanimous decision on this issue.

As soon as the jury returned to the jury room, the trial court informed the lawyers that it intended to give the jury a "dynamite charge." After the lawyers could not agree on the instructions to accompany this supplemental instruction, the trial court stated out of the jury's presence:

> [Y]ou all can assign this as an error, but I'm going to call them back in and give them the dynamite charge. And you all can assign it as error, either one of you, and I'll grant a new trial on that, but I don't think that working this long we should leave the courtroom and not have some sort of an advisor, because the Supreme Court is advocating alternative dispute resolutions and it's -- you know, even if a majority can decide on a certain thing, whatever that majority decides, I'd like to know that to have in the file here, and I'll grant a new trial based on that. But this right here [the partially completed verdict form] as I have got it is an inconclusive, partial verdict.

Thereafter, the trial court summoned the jury back to the courtroom and repeated its original instructions with regard to Michael Ladd's burden of proof and the elements of his misrepresentation claims against the Honda defendants. In addition to these instructions, the trial court instructed the jury as follows:

> Now, five of you have said you don't think it will do any good for this further instruction and several of you have said you thought it would help, could possibly help. I'm reluctant to give you the rest of this charge, but I am. You have worked hard and we're into the 6th week. This is my job. I love my work and I try my best to give fair, impartial instructions to all of you, and I certainly don't want to fuss at anyone. Some jury has got to try this case. And we're not going to ever find a better jury than you are. If we ever find any better listeners, I haven't seen any in the four years I have been on the bench. You have all impressed me as intelligent persons and understanding things in an objective manner. These parties, for whatever reasons that I might perceive or you might perceive need an answer. This accident occurred in the early part of '86. The newspapers and -- well, I don't want to pick on the newspapers, critics say that we move too slowly in the administration of justice. I made it my credo when I took this position here to move litigation as expeditiously as possible without hurrying anyone. I want you to go back there and recognize that as your part; we need an answer to these questions somehow, one way or the other. And those that can sign it, sign it. If you can't conscientiously sign the judgment, those

that can conscientiously sign it, whatever you find, that's an advisory to me and all parties involved. Now, if you will make that much of an effort, we have got another hour here and I appeal to your sense of fair play. Don't surrender your honest convictions but take this and try to arrive at some sort of verdict that will be helpful to all of us. Thank you.

After the jury retired to continue deliberating, the trial court explained to the lawyers that its comment that "we have got another hour here" was not intended to leave the jury with the impression that the trial court had placed a one-hour time limit on the jury's deliberations. Nevertheless, approximately one hour after receiving the supplemental instructions, the jury returned a completed verdict sheet signed only by the foreperson. It answered all questions concerning liability in favor of the Honda defendants. In response to the trial court's questions, each juror confirmed that these answers were their own.

## B.

Juries have the exclusive duty to decide all disputed questions of fact submitted to them, *McCormic v. Smith,* 668 S.W.2d 304, 306 (Tenn. Ct. App. 1984); *Finks v. Gillum,* 38 Tenn. App. 304, 311-13, 273 S.W.2d 722, 726-27 (1954); 8 *Tennessee Pattern Jury Instructions* T.P.I. -- Civil 1.10 (Committee on Pattern Jury Instructions (Civil) of the Tenn. Judicial Conference ed., 2d ed. 1988) ("T.P.I. -- Civil"), based on the law as explained by the trial court. *M'Corry v. King's Heirs,* 22 Tenn. (3 Hum.) 266, 277-78 (1842). Thus, the soundness of every jury verdict rests on the fairness and accuracy of the trial court's instructions. Since the instructions are the sole source of the legal principles needed to guide the jury's deliberations, *State ex rel. Myers v. Brown,* 209 Tenn. 141, 148-49, 351 S.W.2d 385, 388 (1961), trial courts must give substantially accurate instructions concerning the law applicable to the matters at issue. *Street v. Calvert,* 541 S.W.2d at 584; *Mitchell v. Smith,* 779 S.W.2d 384, 390 (Tenn. Ct. App. 1989).

Jury instructions need not be perfect in every detail. *See In re Estate of Elam,* 738 S.W.2d 169, 174 (Tenn. 1987); *Benson v. Tennessee Valley Elec.*

*Coop.,* 868 S.W.2d 630, 642-43 (Tenn. Ct. App. 1993). A single erroneous statement will not necessarily undermine otherwise proper instructions that, on the whole, fairly define the issues and do not mislead the jury. *Cortazzo v. Blackburn,* 912 S.W.2d 735, 745 (Tenn. Ct. App. 1995).

Instructions must be viewed as a whole, *In re Estate of Elam,* 738 S.W.2d at 174; *Memphis St. Ry. v. Wilson,* 108 Tenn. 618, 620, 69 S.W. 265, 265 (1902); *Abbott v. American Honda Motor Co.,* 682 S.W.2d 206, 209 (Tenn. Ct. App. 1984), and the challenged portion of the instructions should be considered in light of its context. *Gorman v. Earhart,* 876 S.W.2d 832, 836 (Tenn. 1994); *Hurst v. Dougherty,* 800 S.W.2d 183, 186 (Tenn. Ct. App. 1990). An erroneous instruction will not be considered reversible error if the trial court explains or corrects it in other portions of the charge. *In re Estate of Elam,* 738 S.W.2d at 174; *Smith v. Parker,* 213 Tenn. 147, 156, 373 S.W.2d 205, 209 (1963).

Juries are generally composed of persons who do not have formal legal training. Accordingly, a trial court's instructions should be couched in plain terms that lay persons can readily understand. *Sasser v. Averitt Express, Inc.,* 839 S.W.2d 422, 430 (Tenn. Ct. App. 1992); *Herstein v. Kemker,* 19 Tenn. App. 681, 702, 94 S.W.2d 76, 89 (1936). It also follows that appellate courts must view the challenged instructions not through the practiced eyes of a judge but rather through the eyes of an average lay juror.

## C.

The jury's verdict is the foundation of the judgment in civil cases where the parties have invoked their constitutional or statutory right to a jury trial. It represents the jury's final statement with regard to the issues presented to them. The verdict, whether general or special, is binding on the trial court and the parties unless it is set aside through some recognized legal procedure. Accordingly, neither the trial court nor the parties are free to disregard a jury's verdict once it has been properly returned. *See Smith County Educ. Ass'n v. Anderson,* 676 S.W.2d 328, 336 (Tenn. 1984).

The Tennessee Supreme Court has recently reviewed a medical malpractice case in which the trial court used a supplemental instruction requesting an advisory verdict substantially similar to the instruction involved in this case. In that case, the jury informed the trial court that it was deadlocked after deliberating for twelve hours over two days. The trial court then requested the jury to

> just spend a little more time as to whether you can give an advisory. I'm talking about an advisory to me and to these lawyers. Some sort of answer is better than nothing.
>
> *          *          *
>
> Now, I know that some of you have said it won't do any good. But some sort of an advisory might be helpful for me, for the lawyers in this case.

*Johnson v. Hardin*, ___ S.W.2d ___, ___ (Tenn. 1996).[7] Following this instruction, the jury wrote a note on the back of the special verdict form stating that they had decided that the defendant had not committed medical malpractice. The trial court entered a judgment for the defendant based on the jury's verdict even though he had told the jury that its verdict was advisory.

The Court concluded that other portions of the trial court's supplemental instructions had improperly coerced the jury into returning a verdict. *Johnson v. Hardin,* ___ S.W.2d at ___.[8] In addition, the Court evaluated the effect of the trial court's characterization of the jury's verdict as an "advisory." The Court concluded:

> An additional factor in our evaluation of the effect of the misguided charge is the judge's characterization of the desired verdict as an "advisory." The jurors and counsel were obviously confused as to the nature of an advisory verdict. Both inquired of the judge as to what he meant. His response, to counsel at least, indicated that he wanted something from the jury to guide counsel in future negotiations.
>
> While advisory verdicts are not unknown in Tennessee in equity matters, see Smith County Education Association v. Anderson, 676 S.W.2d 2d

---

[7] *Johnson v. Hardin*, *supra* note 5, slip op. at 13.

[8] *Johnson v. Hardin, supra* note 5, slip op. at 15-18.

-13-

> [sic] 328 (Tenn. 1984), once a jury is impaneled to render a verdict, that determination is not an advisory opinion, but a final verdict. Further, the jury's findings of fact are binding upon the judge. *Id*. at 337-38. The judge's request for an "advisory" was, at the very least, confusing and inconsistent with Tennessee law. Although the judge polled the jury to inquire whether the finding was the "verdict" of each juror, the note, written on the back of the jury form, may represent nothing more than the jury's inept attempt to render the "advisory" requested by the trial court.

*Johnson v. Hardin,* ___ S.W.2d at ___.[9] While differences exist between the wording of the request for an advisory verdict in this case and the wording of the request in *Johnson v. Hardin* and the context in which the requests were made, these differences are not so great that they place this case beyond the reasoning of the *Johnson v. Hardin* decision.

The jury in this case, like the jury in *Johnson v. Hardin*, had already engaged in lengthy, apparently fruitless, deliberations when the trial court told them that whatever they decided would be "an advisory" for the court and the parties. The trial court also told the jurors that they should record their advisory decision on the special verdict form by answering the questions and by not signing the form if they could not conscientiously sign it.

These instructions must have left the jury with the impression that its decision would not be binding. They must also have induced the jury, already tired from five weeks of trial and fifteen hours of deliberations, to reach a quick decision in order to bring their service on the jury to an end. This is precisely what happened. The jury agreed on an advisory decision within one hour after the supplemental instructions and recorded its decision on the special verdict form that was signed not by the entire jury but by only the foreperson. The jurors' later acknowledgment of the verdict in open court provides no indication that they understood that their decision was anything more than advisory.

We have reviewed the trial court's comments concerning an advisory verdict in light of their immediate context and in light of the entire charge. In the

---

[9]*Johnson v. Hardin, supra* note 5, slip op. at 18-19.

-14-

context in which they were made, these comments could only have confused the jury with regard to its proper role by leaving the jury with the impression that its decision would not finally resolve the dispute between the parties. This confusion, more probably than not, affected the judgment in this case and forces us to conclude, like the Tennessee Supreme Court in the *Johnson v. Hardin* case, that the jury's decision was not a considered, unanimous verdict.[10]

## IV.
### MICHAEL LADD'S MISREPRESENTATION CLAIM

We turn next to Michael Ladd's claim that the Honda defendants had misrepresented the handling characteristics of all-terrain vehicles by advertising that they were safe enough to be operated by children. The Honda defendants assert that Michael Ladd cannot succeed with this claim without proving that they misrepresented the handling characteristics of the particular model of all-terrain vehicle involved in this case. Michael Ladd responds that his claim may rest on proof that the Honda defendants misrepresented the handling characteristics of all-terrain vehicles in general. We agree with Michael Ladd.

### A.

It was clear from the outset that Michael Ladd's principal claim against the Honda defendants was predicated on their advertisements from the early 1970s to the mid-1980s representing that all-terrain vehicles could be operated safely by children under sixteen years of age. He asserted that these advertisements were misrepresentations because they created the illusion that all-terrain vehicles were safe when, in fact, they were not. He also asserted that Erby Givens's and his parents' impressions of the safe use of all-terrain vehicles had been shaped by Honda's advertising and that they had permitted him to operate Mr. Givens's all-terrain vehicle because of their impression that he could safely do so.

---

[10]We have confined our analysis of this issue to the portion of the trial court's instructions requesting an advisory verdict. We have not considered whether other portions of the charge improperly coerced the jury into reaching a decision since we addressed this issue on the earlier interlocutory appeal of this case and our decision has become the law of the case.

The Honda defendants insisted that the evidence with regard to Michael Ladd's misrepresentation claim should be limited to its advertisements concerning the 1986 Honda TRX 250 - the particular all-terrain vehicle Michael Ladd was operating when he was injured. Prior to trial, they sought to preclude the introduction of all evidence that did not relate to the 1986 Honda TRX 250 on the ground of relevance. The trial court overruled the objections and permitted Michael Ladd to introduce evidence of the development and marketing of all-terrain vehicles from the early 1970s to the mid-1980s to prove that Honda's marketing had shaped the public's perception of the use and safety of all-terrain vehicles and that this marketing had misled the public into believing that all-terrain vehicles could be operated safely by children.

**B.**

Honda first introduced all-terrain vehicles into the United States market in the early 1970s. They were modeled after motorcycles but had three wheels. Since they were intended to be used year-round in all types of weather and terrain, the marketing of these vehicles was originally directed toward off-road enthusiasts. Honda shifted its marketing strategy in the early 1980s to begin promoting all-terrain vehicles as suitable for family recreation. Its broadcast and print advertising depicted entire families, including young children, safely operating all-terrain vehicles. In 1984, Honda introduced a four-wheeled all-terrain vehicle into the United States market and marketed it as a utility vehicle that could also be used for sports and recreation.

The rate of accidents and injuries associated with all-terrain vehicles increased dramatically during the 1970s and 1980s. The Consumer Product Safety Commission launched an industry-wide investigation in 1984. The all-terrain vehicle manufacturers retained a child safety expert who advised them that their advertising should be more realistic and safety-oriented. The expert also recommended that parents should be better informed about the problems and dangers in using all-terrain vehicles before purchasing them for their children. Despite these private warnings, Honda responded publicly to the Consumer Product Safety Commission that children as young as seven or eight years old

could safely operate an all-terrain vehicle and that three and four-wheeled all-terrain vehicles, like large and compact automobiles, had advantages and disadvantages.

Erby Givens bought his Honda TRX 250 in January 1986. His decision to purchase this particular all-terrain vehicle was chiefly influenced by his brother's decision to purchase one, not by any of Honda's advertisements. None of Honda's advertisements of the 1986 Model TRX 250 depicted it being operated by young children.

Eight months after Michael Ladd's injury, the Consumer Product Safety Commission released its findings that all-terrain vehicles represented an imminent hazard to American consumers. In December 1987, the Department of Justice filed suit against all manufacturers selling all-terrain vehicles in the United States, alleging that all-terrain vehicles required a high degree of skill and attentiveness despite their deceptively safe outward appearance. The commission also alleged that the all-terrain vehicle industry had failed to provide potential users with adequate warnings of the hazards associated with the operation of all-terrain vehicles.

The all-terrain vehicle industry immediately settled with the Department of Justice. In March 1988, Honda signed a consent agreement in which it agreed to stop distributing and marketing three-wheeled all-terrain vehicles. Honda also agreed to warn the consuming public that children under sixteen years of age should never ride an adult-sized all-terrain vehicle,[11] to mail safety alerts to all past purchasers, and to provide similar safety alerts to all future purchasers.

## C.

---

[11]The Honda TRX 250 is an adult-sized all-terrain vehicle.

In the early 1930s American courts began to hold sellers strictly liable for injuries to consumers who relied on the seller's misrepresentations concerning their product's character and quality. In one of the leading decisions, the Washington Supreme Court held that a manufacturer who advertised that its automobile's windshield was shatterproof was liable to a purchaser who was injured when a windshield shattered after being struck by a stone. *Baxter v. Ford Motor Co.,* 12 P.2d 409, 412 (Wash. 1932). The American Law Institute included these decisions in Restatement (Second) of Torts § 402B (1964) which provides:

> One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though
> (a) it is not made fraudulently or negligently, and
> (b) the consumer has not bought the chattel from or entered into any contractual relation with the seller.

Despite being a "corollary" of the widely accepted strict liability doctrine articulated in Restatement (Second) of Torts § 402A (1964),[12] liability for innocent misrepresentation under Section 402B has been recognized in only a minority of jurisdictions. 1 Louis R. Frumer & Melvin I. Friedman, *Products Liability* § 2.05[4], at 2-76 & n.88 (1996); *Misrepresentation,* 1 Prod. Liab. Rep. (CCH) ¶ 1900, at 4991 (1993). One treatise has surmised that Section 402B has been overshadowed by the broad acceptance of Section 402A. 1 Frumer & Friedman, *supra,* § 2.05[4], at 2-76 to 2-80.

The Tennessee Supreme Court first recognized Section 402B claims thirty years ago, *Ford Motor Co. v. Lonon,* 217 Tenn. 400, 423, 398 S.W.2d 240, 250 (1966), *rev'd on other grounds, First Nat'l Bank v. Brooks Farms,* 821 S.W.2d 925, 931 (Tenn. 1991), and has recently reaffirmed its decision. *Ritter v. Custom Chemicides, Inc.,* 912 S.W.2d 128, 131-32 (Tenn. 1995). The General Assembly likewise included Section 402B claims in the Tennessee Products Liability Act of 1978. *See* Tenn. Code Ann. § 29-28-102(6) (1980).

---

[12]*American Safety Equip. Corp. v. Winkler,* 640 P.2d 216, 218-19 (Colo. 1982).

A claim based on Section 402B is entirely distinct from a Section 402A claim. It does not condition liability on the product being defective or unreasonably dangerous. *Ford Motor Co. v. Lonon,* 217 Tenn. at 423, 398 S.W.2d at 250; Tenn. Code Ann. § 29-28-105(c) (1980); 1 Frumer & Friedman, *supra,* § 2.05[4], at 2-79 n.91. Rather, it focuses on whether the product conforms to the manufacturer's express statements about the product. *Klages v. General Ordnance Equip. Corp.,* 367 A.2d 304, 310-11 (Pa. Super. Ct. 1976). In order to create liability under Section 402B, there must be proof of a misrepresentation of a material fact, made to the public, with respect to the character and quality of the product, which is false and upon which the consumer is expected to justifiably rely. Restatement (Second) of Torts § 402B; 1 Frumer & Friedman, *supra,* § 2.05[4], at 2-80 to 2-83. The representations must be more than mere statements of opinion or the kind of loose general sales talk commonly referred to as "puffing." Restatement (Second) of Torts § 402B cmt. g.

The Tennessee Products Liability Act of 1978 includes causes of action based on Section 402B. Tenn. Code Ann. § 29-28-102(6); *First Nat'l Bank v. Brooks Farms,* 821 S.W.2d at 931. Accordingly, causes of action for misrepresentation must be couched in the terms used in the products liability statutes rather than the terms used in the Restatement. Tennessee's product liability statutes apply to "products" which include "any tangible object[s] or goods produced," rather than to "chattels."[13] Tenn. Code Ann. § 29-28-102(5).

We must still determine whether the term "product" refers only to a specific model or brand or whether it may refer more generally to similar types of goods. The Honda defendants insist that "product" should be limited to a specific model or item because actions based on Section 402B derive from actions on an express warranty and an express warranty must be model-specific. While the Restatment recognizes the concept of misrepresentation as a non-contractual express warranty, it also points out that this warranty "is at least a different kind of warranty from

---

[13]The Restatement (Second) of Torts used the term "chattel" in Section 402B. We see no meaningful distinction between the terms "chattel" and "product" which are frequently used interchangeably. Adhering to the language of the Tennessee Products Liability Act of 1978, we will continue to use the term "product."

that involved in the ordinary sale of goods . . . and is subject to different rules."
Restatement (Second) of Torts § 402B cmt. d.

When the Tennessee Supreme Court approved causes of action based on Section 402B, it noted that it viewed the claim as one based on a misrepresentation theory rather than a warranty theory. *Ford Motor Co. v. Lonon,* 217 Tenn. at 419, 398 S.W.2d at 248. Likewise, liability under the Tennessee Products Liability Act of 1978 includes "all actions brought for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product" notwithstanding whether the claim is predicated on contract, warranty, tort, or misrepresentation. Tenn. Code Ann. § 29-28-102(6). Based on these authorities, we conclude that a products liability cause of action based on innocent misrepresentations concerning the character or quality of a product is not subject to the same limitations that might otherwise be applicable to actions based on an express warranty relating to a specific product.[14]

We have been unable to find any cases construing Section 402B that discuss the definition of "product" or "chattel." Three cases addressed evidentiary issues similar to the ones involved in this case, but none of these cases discussed the admissibility of advertisements in terms of the scope of liability under Section 402B. Two decisions excluded advertisements about a different model of a product. In one case involving a claim of misrepresentation concerning the safety of a Jeep CJ-5 under certain driving conditions, the court excluded television commercials depicting a Jeep Cherokee. *Haynes v. American Motors Corp.,* 691 F.2d 1268, 1270 (8th Cir. 1982). In the other case, the court held that a sales brochure containing pictures and representations about school buses was not relevant to a claim that the same manufacturer had made misrepresentations about its activity buses. *Collins v. Wayne Corp.,* 621 F.2d 777, 787 (5th Cir. 1980).

---

[14]We need not decide here whether actions based on express warranties must always be model-specific. We note, however, that the seminal case of *Baxter v. Ford Motor Co.*, from which Restatement (Second) of Torts § 402B was developed, involved a representation concerning all Ford automobiles, not just a specific model.

Contrary to these cases, the Iowa Supreme Court held that advertisements of a different model of automobile were admissible to prove a misrepresentation claim. In a case involving a 1968 Chevelle, the trial court permitted the introduction of advertisements of the Chevelle from 1967, 1969, and 1970 because the purchaser "ha[d] tied in these ads in with the same automobile that he did purchase." *Jacobson v. Benson Motors, Inc.,* 216 N.W.2d 396, 402-03 (Iowa 1974).

Each of these cases was essentially resolved on relevancy grounds. The opinion in *Jacobson v. Benson Motors, Inc.* indicates that the plaintiff had demonstrated that the different models were essentially similar. The plaintiff in the *Collins v. Wayne Corp.* case apparently did not make a similar showing and did not rely on representations that applied to both activity buses and school buses. We cannot tell from the *Haynes v. American Motors Corp.* opinion whether the plaintiff attempted to demonstrate that the models were similar or that the misrepresentations applied to more than one model.

None of these cases hold as a matter of law that liability under Section 402B is limited to misrepresentations about a particular model. We have cited them simply to show that courts deciding similar issues to the one involved in this case have based their decisions on the ad hoc basis of relevancy. None of these cases undertook to construe the word "chattel" or "product" under Section 402B. Lacking specific direction from either Section 402B, the Tennessee Products Liability Act of 1978, or the case law from this or other jurisdictions, we turn to the underlying purposes of Section 402B to determine whether "product line misrepresentations" are actionable under Section 402B.

Section 402B addresses a manufacturer's liability for innocent misrepresentations made through "advertising, labels, or otherwise." It was the law's response to the increasing use of television, radio, and other advertising media to extol the worth, quality, and benefits of various products in glowing details and terms. *Randy Knitwear, Inc. v. American Cyanamid Co.*, 181 N.E.2d 399, 402 (N.Y. 1962); *Rogers v. Toni Home Permanent Co.*, 147 N.E.2d 612, 615-16 (Ohio 1958). It recognizes that commercial advertising of products is often the

guiding force in shaping consumers' expectations about a product. *Leichtamer v. American Motors Corp.*, 424 N.E.2d 568, 578 (Ohio 1981); *Inglis v. American Motors Corp.*, 197 N.E.2d 921, 924 (Ohio Ct. App. 1964), *aff'd*, 209 N.E.2d 583 (Ohio 1965).

Accordingly, Section 402B provides a basis for holding manufacturers accountable for the public's reliance on the representations in their advertisements about the character and quality of their products. Consumers should be able to rely on representations in advertisements for an entire product line in the same way that they rely on advertisements for particular models in a product line. Thus, manufacturers should not be permitted to insulate themselves from liability under Section 402B simply by using general advertisements of an entire product line. Accordingly, we see no reason why manufacturers should not be held liable in actions based on Section 402B if their general advertisements of a product line contain representations of the character or quality of particular models in the product line and if the other conditions for liability under Section 402B have been met.

The Honda advertising introduced by Michael Ladd extolled the use of all-terrain vehicles in general. It contained representations concerning the safety of all-terrain vehicles and, without being model-specific, portrayed all-terrain vehicles as being suitable for use by the entire family - including small children. Thus, we see no reason to shield the Honda defendants from liability under Section 402B for representations in their advertising about all-terrain vehicles in general if the general advertising contained misrepresentations applicable to all Honda all-terrain vehicles, including the specific all-terrain vehicle Michael Ladd was operating when he was injured.

## V.

### THE DEFENSES TO MICHAEL LADD'S MISREPRESENTATION CLAIM

The Honda defendants asserted two principal defenses at trial against Michael Ladd's misrepresentation claim. First, they argued that their advertisements did not contain the type of misrepresentations of the character or

quality of their product that would subject them to liability. Second, they claimed that Michael Ladd did not prove his misrepresentation claim because Mr. Givens did not rely on Honda's advertisements when he purchased his all-terrain vehicle. We find that neither of these defenses was sufficient to prevent the case from being submitted to the jury.

## A.

Liability for misrepresentation under Restatement (Second) of Torts § 402B arises only with regard to misrepresentations of material facts concerning the character and quality of the product in question. It does not arise from statements of opinion and, in particular, to the "kind of loose general praise of wares sold which, on the part of the seller, is considered to be 'sales talk,' and is commonly called 'puffing.'" Restatement (Second) of Torts § 402B cmt. g. The Honda defendants asserted at trial that their advertisements depicting young children riding all-terrain vehicles were no more than puffing.

"Puffing" refers to loose general statements made by sellers in commending their products. These statements embody exaggerations, the truth or falsity of which cannot be determined easily, that amount to no more than an expression of the seller's opinion about the character or quality of the product. *Loula v. Snap-On Tools Corp.,* 498 N.W.2d 866, 868 (Wis. Ct. App. 1993). Buyers have no right to rely on these statements. Thus, a seller's characterization of an automobile as a "dandy" or a "good little car" or the "pride of our line" or the "best in the American market" will not give rise to liability under Section 402B. *See* Restatement (Second) of Torts § 542 cmt. e (1976).

The courts have generally been cautious about a seller's claim that its representations were mere puffing. Thus, the question of whether a particular statement amounts to an actionable misrepresentation will generally be left to the jury whenever the circumstances indicate that the buyer reasonably understood that he or she was receiving something in the way of an assurance as to specific facts. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 109, at 757 (5th ed. 1984). The courts are also more inclined to send close cases to the jury when

the representation at issue relates directly to the product's safety. *Hoffman v. A.B. Chance Co.,* 346 F. Supp. 991, 992 (M.D. Pa. 1972) (representation that it was unnecessary to have another person in the cab when operating the tractor); *Hauter v. Zogarts,* 534 P.2d 377, 381 (Cal. 1975) (representation that a golf training device was "completely safe [because the] ball will not hit [the] player"); *but see Hoffman v. A.B. Chance Co.,* 339 F. Supp. 1385, 1388 (M.D. Pa. 1972) (statement that the product provided "unprecedented safety" was puffing).

The Honda defendants rely heavily on the Washington Supreme Court's holding that television commercials describing a mini-trail bike as "a very good bike for children" and showing children riding mini-trail bikes were mere puffing. *Baughn v. Honda Motor Co.,* 727 P.2d 655, 668 (Wash. 1986). We do not find the *Baughn* decision to be persuasive in this case because it is factually distinguishable. The children in *Baughn* were operating a mini-trail bike on a public road despite warnings in the owner's manual and on a decal on the bike itself that the bike was for off-road use only. Their parents had also warned them repeatedly not to use mini-trail bikes for street riding because they might get hurt. While the television advertising at issue in the *Baughn* case depicted children riding mini-trail bikes, it did not depict them operating mini-trail bikes on a public street. Accordingly, the manufacturer's advertizing at issue in *Baughn* did not create the impression in the minds of the children or their parents that mini-trail bikes could be operated safely on public streets.

In this case, Michael Ladd presented proof that all-terrain vehicles could not be operated safely by any child under the age of sixteen, that Honda's advertisements represented that all-terrain vehicles could be operated by young children, and that these advertisements materially influenced the decision of his uncle and his father to permit him to operate the all-terrain vehicle. Thus, the facts of this case make out the necessary element of justifiable reliance that is missing in the *Baughn* case. They also demonstrate that the representations in the advertisements were material to the decision to permit Michael Ladd to operate the all-terrain vehicle.

A misrepresentation claim should be submitted to the jury when the representation at issue may reasonably be interpreted either as an expression of opinion or as a statement of fact. *Stamp v. Honest Abe Log Homes, Inc.,* 804 S.W.2d 455, 458 (Tenn. Ct. App. 1990); *Mackie v. Fuqua,* 14 Tenn. App. 176, 185 (1931). At the very least, the issue concerning whether Honda's advertisements showing entire families riding all-terrain vehicles amounted to a misrepresentation that children like Michael Ladd could safely operate all-terrain vehicles should be decided by a jury.

### B.

The Honda defendants also asserted that Michael Ladd did not make out a Section 402B misrepresentation claim because he failed to produce evidence of reliance on their advertising. They pointed chiefly to Mr. Givens's testimony that he bought his Honda TRX 250 not because of any of Honda's advertisements but because his brother had purchased the same vehicle. Even though Mr. Givens's decision to purchase an all-terrain vehicle is largely irrelevant, we will address the reliance issue briefly in light of our decision to remand this case for another trial.

Section 402B requires that a consumer must justifiably rely upon the misrepresentation in order for liability to arise. The comments to Section 402B discuss the element of reliance and point out that liability under Section 402B will not arise "where the misrepresentation is not known, or there is indifference to it, and it does not influence the purchase or subsequent conduct." Restatement (Second) of Torts § 402B cmt. j. Thus the consumer's reliance may relate to other later conduct, not just to the consumer's decision to purchase the product.

Michael Ladd does not dispute that Mr. Givens admitted that his decision to purchase the Honda TRX 250 was not influenced by Honda's advertisements. However, as we pointed out earlier in this opinion, Michael Ladd's claim does not involve Mr. Givens's decision to purchase the all-terrain vehicle but rather his decision to permit Michael Ladd to operate it. Mr. Givens testified specifically that seeing children on television riding all-terrain vehicles led him to believe that Michael Ladd could safely operate his all-terrain vehicle.

Mr. Givens's reliance on Honda's advertising in deciding whether to permit Michael Ladd to operate his all-terrain vehicle satisfies Section 402B's reliance requirement. Michael Ladd is a "consumer" for the purpose of Section 402B because he "ma[de] use of the chattel in the manner which a purchaser may be expected to use it." Restatement (Second) of Torts § 402B cmt. I. The reliance required by Section 402B need not be that of the injured consumer but may be that of the purchaser who passes the product along to the ultimate consumer. *Baughn v. Honda Motor Co.,* 727 P. 2d at 668; Restatement (Second) of Torts § 402B cmt. j (the reliance "may be that of the ultimate purchaser of the chattel, who because of such reliance passes it on to the consumer who is in fact injured").

## VI.
### THE TRIAL COURT'S INSTRUCTIONS

Michael Ladd also asserts that the trial court did not properly present his misrepresentation claim to the jury because its instructions did not accurately reflect his theory of liability and because the instructions and the questions on the special verdict form were inconsistent. The Honda defendants respond that the instructions correctly stated the law relating to misrepresentation claims and, in any event, that Michael Ladd's lawyer did not effectively object to the instructions or the questions on the special verdict form. We find that Michael Ladd's lawyer properly took issue with these matters. We also find that the trial court's burden of proof instruction misstated the law and did not accurately reflect Michael Ladd's theory of the case and that the instructions improperly conflicted with the questions on the special verdict form.

### A.

The trial court conducted a charge conference on April 8, 1993 after the close of the proof but before final arguments. During the conference, the parties presented their respective positions with regard to the instructions concerning the elements of Michael Ladd's misrepresentation claim as well as the parties' respective burdens of proof. They also discussed the trial court's decision not to

provide the jury with a written copy of its instructions and the use of special interrogatories.

After Michael Ladd's lawyer would not agree to the Honda defendants' proposed burden of proof instruction,[15] the trial court requested the parties to submit additional instructions. The trial court acknowledged that it had overlooked an instruction defining the elements of a Section 402B misrepresentation claim in its draft instructions and agreed to both parties' requests for an instruction based on T.P.I. -- Civil 10.20. In addition, the trial court solicited suggestions concerning the verdict form in light of its decision not to provide the jury with a written copy of its instructions. The Honda defendants proposed lengthy special interrogatories to guide the jury's deliberations. Michael Ladd, who had originally requested that the jury receive a copy of the written instructions, preferred a general verdict and a short verdict form.

The parties submitted revised burden of proof instructions on April 12, 1993. The instruction proposed by the Honda defendants stated that Michael Ladd had the burden of proving by a preponderance of the evidence "[t]hat the Honda Defendants made material misrepresentations about the 1986 Honda TRX 250 and the plaintiff relied on such misrepresentation." On the other hand, Michael Ladd requested a broader instruction stating that he had the burden of establishing by a preponderance of the evidence "[t]hat the Honda defendants misrepresented the characteristics of the All-terrain vehicles and the plaintiffs relied on such misrepresentation."

The trial court and the parties continued their discussion about the instructions following the closing arguments. Lacking a consensus on the burden of proof instruction, the trial court announced that it would use the Honda defendants' burden of proof instruction and Michael Ladd's special verdict form. The trial court adhered to its decision despite the concern of one of Michael Ladd's lawyers that the instructions and the special verdict form should be consistent. Accordingly, the trial court instructed the jury that Michael Ladd had the burden

---

[15]The Honda defendants' burden of proof instruction stated that the plaintiff must prove by a preponderance of the evidence that they "made material misrepresentations about the vehicle which were not true . . .."

of proving that "the Honda defendants made material misrepresentations about the Honda TRX 250" and then provided the jury a special verdict form asking, "[d]o you find that the Honda defendants misrepresented the characteristics of all-terrain vehicles?"

The jury soon encountered problems with Michael Ladd's misrepresentation claim. On April 13, 1996, it requested additional instructions concerning the meaning of "characteristics" as it was used on the special verdict form. On this occasion, the trial court declined to expand on or repeat its original instruction. One day later, the jury informed the trial court that it was deadlocked on the misrepresentation claim. The trial court repeated its original instructions pertaining to Michael Ladd's burden of proof and the elements of a misrepresentation claim. Repeating these instructions apparently did not resolve the jury's difficulties because it soon requested a written copy of these instructions. The trial court complied with this request despite Michael Ladd's objection.

**B.**

The trial court's instructions should be complete and accurate and should fairly reflect the parties' theories of the case. *Cole v. Woods,* 548 S.W.2d 640, 642 (Tenn. 1977); *Street v. Calvert,* 541 S.W.2d at 584; *Grissom v. Metropolitan Gov't,* 817 S.W.2d 679, 685 (Tenn. Ct. App. 1991). Trial courts should not give inconsistent instructions. *Citizens' St. R.R. v. Shepherd,* 107 Tenn. 444, 449-50, 64 S.W. 710, 711 (1901); *Abbott v. American Honda Motor Co.,* 682 S.W.2d at 209. Thus, trial courts should give a requested instruction (1) if it is supported by the evidence, (2) if it embodies the party's theory of the case, (3) if it is a correct statement of the law, and (4) if its substance has not already been included in other portions of the charge, *Spellmeyer v. Tennessee Farmers Mut. Ins. Co.,* 879 S.W.2d 843, 846 (Tenn. Ct. App. 1993). It should deny requested instructions that are erroneous or incomplete. *Betty v. Metropolitan Gov't,* 835 S.W.2d 1, 10 (Tenn. Ct. App. 1992).

The parties submitted inconsistent proposed instructions regarding Michael Ladd's burden of proof on his misrepresentation claim. Michael Ladd's instruction

relied on Honda's advertising of all its all-terrain vehicles between the early 1970s and the mid-1980s; while the Honda defendants' instruction was limited to the advertisements of the Honda TRX 250. The trial court used the Honda defendants' proposed instruction.

We concluded in Section IV of this opinion that Section 402B misrepresentation claims may be based on representations contained in general advertising for an entire product line. Accordingly, the Honda defendants' proposed instruction was not a correct statement of the law. It likewise did not fairly embody Michael Ladd's theory of liability. Michael Ladd never claimed that the advertisements for the Honda TRX 250 contained representations that children could operate it safely. Rather, he claimed that Honda advertising from the early 1970s to the mid-1980s represented that all-terrain vehicles were suitable for family fun and were safe enough to be operated by children. The instruction limited the jury's consideration of the misrepresentation issue to statements specifically made about the 1986 Honda TRX 250. Since Michael Ladd had asserted that Honda had misrepresented all of its all-terrain vehicles, this instruction was erroneous.

## C.

An erroneous instruction will not require reversal if it is corrected or explained in another portion of the charge. *In re Estate of Elam,* 738 S.W.2d at 174; *Smith v. Parker,* 213 Tenn. at 156, 373 S.W.2d at 209. In this case, the trial court never corrected the error in its burden of proof instruction and, in fact, compounded it by repeating the instruction, by providing the jury with a written copy of this portion of the charge, and by providing the jury with an inconsistent special interrogatory.

Repeating instructions is not necessarily erroneous, *Cortazzo v. Blackburn,* 912 S.W.2d at 745, as long as the repeated instruction is broad enough to cover the misunderstood issues completely without unduly emphasizing the particular portion of the charge. *Berry v. Conover,* 673 S.W.2d 541, 544-45 (Tenn. Ct. App. 1984). The trial court repeated its instructions concerning the elements of a

misrepresentation claim and Michael Ladd's burden of proof after the jury announced that it was deadlocked on the misrepresentation claim. Repeating the instructions was appropriate; however, the trial court later provided the jury with a written copy of only these portions of the charge. Under the circumstances of this case, providing the jury a written copy of only a portion of the charge improperly emphasized that portion of the charge.

Although the special interrogatory on the misrepresentation issue correctly presented Michael Ladd's theory of the case to the jury, it did not specifically correct the erroneous portion of the trial court's charge. Rather, the inconsistency between the instruction and the interrogatory only served to confuse the jury further, as evidenced by the requests for clarification of "characteristics" in the interrogatory and for repetition of the misrepresentation and burden of proof instructions.

Inconsistent instructions and interrogatories, like two inconsistent instructions, do not neutralize or validate each other but rather intensify the risk that the jury will be confused. *See State v. Stephenson,* 878 S.W.2d 530, 555 (Tenn. 1994); *Citizens' St. R.R. v. Shepherd,* 107 Tenn. at 449-50, 64 S.W. at 711. We have determined that the erroneous charge and the inconsistency between the charge and the special interrogatory more probably than not affected the jury's verdict in this case and, therefore, that they constitute reversible error.[16]

**D.**

Providing the jury with a written copy of the instructions can be quite helpful in civil cases. However, unlike the procedure in felony cases, *see* Tenn. R. Crim. P. 30(c), juries in civil cases are not entitled to take a written copy of the trial

---

[16]The instructions contain another error not briefed by the parties that is material enough to mention here because this case will be retried. The trial court instructed the jury that "[a] manufacturer of a product is not liable for any injury to a person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer." While this is a correct statement of the law with regard to most claims under the Tennessee Products Liability Act of 1978, it does not apply to claims based on misrepresentation. *See* Tenn. Code Ann. § 29-28-105(c). The trial court failed to explain this distinction in the portions of its instructions dealing with Michael Ladd's burden of proof, the misrepresentation claim, or the products liability claims.

court's instructions into the jury room. While trial courts must, on request, reduce their jury charge to writing for the benefit of the attorneys in civil cases, Tenn. Code Ann. § 20-9-501 (1994), they are not required to provide a written copy of their instructions to the jury. *In re Estate of Depriest*, 733 S.W.2d 74, 77 (Tenn. Ct. App. 1986); *Smith v. Steele*, 44 Tenn. App. 238, 251, 313 S.W.2d 495, 501 (1956).

The Tennessee Supreme Court entered an order in 1991 proposing an amendment to Tenn. R. Civ. P. 51 to require that juries in civil cases be provided with a written copy of the instructions. *In Re Tennessee Rules of Civil Procedure* (Tenn. Jan. 25, 1991). The Court withdrew the proposed rule one month later without explanation. *In re: Tennessee Rules of Civil Procedure Amendment to Proposed Amendment - Rule 51, Tennessee Decisions*, 797-802 S.W.2d at XXX (order entered February 28, 1991). Thus, the decision to provide the jury with a written copy of the instructions in a civil case remains discretionary with the trial court.

A written copy of the trial court's entire charge would probably have benefitted the jury in this case. However, in light of the present state of the law with regard to providing the jury with written instructions, we cannot conclude that the trial court erred by denying Michael Ladd's request to provide the jury with a written copy of the entire charge. The trial court's error was to submit only a portion of its charge to the jury over Michael Ladd's objections. Because of the risk of improper emphasis, trial courts should avoid providing juries with a written copy of only a portion of their charge. If all counsel concur in providing only a portion of the charge in writing, the charge should contain an instruction substantially similar to T.P.I. -- Civil 1.11.

## VII.
### THE TRIAL COURT'S ROLE AS THIRTEENTH JUROR

Michael Ladd also asserts that the trial court erred in fulfilling its role as thirteenth juror. He argues that the trial court's comments both before and after the

trial demonstrate that the trial court misunderstood its role as thirteenth juror. His principal argument seems to be, however, that the trial court could not adequately perform its function as thirteenth juror due to the fifteen month delay between the trial and his review of the verdict. We disagree.

A court speaks only through its written orders. *Massachusetts Mut. Life Ins. Co. v. Taylor Implement & Vehicle Co.*, 138 Tenn. 28, 39, 195 S.W. 762, 765 (1917); *Evans v. Perkey*, 647 S.W.2d 636, 641 (Tenn. Ct. App. 1982). While the appellate courts may consider the trial court's comments made in the course of reviewing a motion for new trial, *Ridings v. Norfolk S. Ry.*, 894 S.W.2d 281, 289 (Tenn. Ct. App. 1994), our review is limited to determining whether the trial court properly reviewed the evidence and was satisfied or dissatisfied with the verdict. *Herbert v. Brazeale*, 902 S.W.2d 933, 936 (Tenn. Ct. App. 1995). The accuracy of the trial court's determination as thirteenth juror is not a proper subject of appellate review. *State v. Moats*, 906 S.W.2d 431, 435 (Tenn. 1995).

The thirteenth juror rule requires the trial court to weigh the evidence independently, to pass upon the issues, and to decide whether the verdict is supported by the evidence. *Curran v. State*, 157 Tenn. 7, 13, 4 S.W.2d 957, 958 (1928); *Loeffler v. Kjellgren,* 884 S.W.2d 463, 468-69 (Tenn. Ct. App. 1994). If the trial court comments on the record about its determination as thirteenth juror, its ruling should be clear and unequivocal. *State v. Moats*, 906 S.W.2d at 435. This court must remand a case for a new trial if the trial court's comments demonstrate dissatisfaction with the verdict. *Cumberland Tel. & Tel. Co. v. Smithwick*, 112 Tenn. 463, 467-68, 79 S.W. 803, 804 (1904); *Miller v. Doe*, 873 S.W.2d 346, 347 (Tenn. Ct. App.1993).

In this case, the trial court finally reviewed the jury's verdict from its vantage point as thirteenth juror fifteen months after the trial. The passage of time alone provides no basis for concluding that the trial court could not or did not properly review the verdict. The October 18, 1994 order clearly and unequivocally demonstrates that the trial court understood and properly performed its role as thirteenth juror.

# VIII.

## THE RETURN OF A GENERAL VERDICT

Michael Ladd finally asserts that the trial court erred by not directing the jury to return a general verdict. While Tenn. R. Civ. P. 49.03 preserves the right to a general verdict, the right must be exercised prior to the time the jury retires. Even when a general verdict has been requested, the court may require the jury to answer special interrogatories. Tenn. R. Civ. P. 49.02. Using special interrogatories is especially appropriate when the issues in the case are numerous and involved. *See Sharpe v. City of Lewisburg,* 677 F. Supp. 1362, 1364 (M.D. Tenn. 1988); *Mitchell v. Jennings,* 836 S.W.2d 575, 577 (Tenn. Ct. App. 1992).

The issues involved in this case are complex and involved. Accordingly, the trial court properly exercised its discretion to use special interrogatories to assist the jury in rendering a reasoned verdict consistent with the proof. However, any of the parties would have been entitled to a general verdict had they requested one in a timely manner. While Michael Ladd's lawyer told the trial court during the charge conference that he would prefer a general verdict because the trial court had decided not to provide the jury with a written copy of its instructions, he never formally demanded a general verdict and did not object when the trial court announced its decision to use the special interrogatories that the lawyer himself had prepared. Accordingly, we do not find that the trial court's failure to require the jury to return a general verdict was error.

# IX.

For the reasons stated herein, we reverse the judgment and remand the case for a new trial consistent with this opinion. We also tax the costs of this appeal joint and severally to Honda Motor Co., Ltd., Honda R & D Co., Ltd., and American Honda Motor Co., Inc. for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

CONCUR:


_____
HENRY F. TODD, P.J., M.S.

-34-

_____
BEN H. CANTRELL, JUDGE