# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### January 21, 2014 Session

## LINUS THORNTON v. JAMES A. MASSEY

**An Appeal from the Circuit Court for Hardin County**
**No. 3891      C. Creed McGinley, Judge**

**No. W2013-01022-COA-R3-CV - Filed May 30, 2014**

This is the second appeal in this breach of contract case. The defendant property owner leased his recreational farm on a yearly basis to the plaintiff lessee. Their agreement included a provision that, when the farm sold, the plaintiff would received a percentage of the proceeds of the sale. The defendant eventually divided the farm into several parcels and sold the parcels at auction to different purchasers. The plaintiff asserted his right to a percentage of the proceeds. Thereafter, for reasons that are disputed, none of the sales of the various parcels of the farm closed. The plaintiff filed this lawsuit against the defendant owner, asserting that he was entitled to a percentage of the total sale price that would have been realized had all of the sales closed. After a trial, the trial court held in favor of the plaintiff, and the defendant appealed. In the first appeal, the appellate court affirmed in part but vacated the judgment and remanded for the trial court to make a factual finding as to whether the sales failed to close because of the purposeful actions of the defendant. On remand, the trial court found that the closings on the sales failed to take place because of the defendant owner's purposeful actions. The trial court found that the defendant prevented the sales from closing in order to avoid paying the plaintiff the percentage owed him under the parties' lease agreement. The trial court reinstated the damage award in favor of the plaintiff and awarded prejudgment and post-judgment interest. The defendant now appeals. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

Dennis W. Plunk, Savannah, Tennessee, and Mary Stewart Nelson, Birmingham, Alabama, for the Defendant/Appellant, James A. Massey

Charles C. Drennon, III, Memphis, Tennessee, for the Plaintiff/Appellee, Linus Thornton

## OPINION

This is the second appeal in this case. *See Thornton v. Massey*, No. W2006-01417-COA-R3-CV, 2007 WL 1438766 (Tenn. Ct. App. May 17, 2007) ("*Thornton I*"). Plaintiff/Appellee Linus Thornton ("Mr. Thornton") and Defendant/Appellant James A. Massey ("Mr. Massey") became acquainted in 1991. Mr. Thornton was a cattleman and farmer, and Mr. Massey was a businessman/investor; together they engaged in a variety of business dealings.

Relevant to this appeal, in October 1998, Mr. Massey leased to Mr. Thornton real property known as Grandview Farm ("the farm"), an income-producing recreational farm in Hardin County, Tennessee. Initially, Mr. Thornton leased the farm from Mr. Massey for a one-year term, beginning October 1, 1998. The lease included an automatic renewal provision under which the lease would automatically renew unless it was canceled in writing 60 days prior to the original term.

At the same time they executed the lease, the parties entered into a "Memorandum of Agreement" that outlined both parties' intentions. The memorandum of agreement stated that Mr. Thornton intended "to raise cattle on the Farm." It also stated that Mr. Thornton agreed to "be responsible for maintaining and upgrading the Farm with the intention of turning it into a 1ˢᵗ class farming, ranching and recreational operation." The parties understood that Mr. Thornton would live on the farm rent-free and earn money from income-producing activities on the farm. The memorandum of agreement stated the parties' intent "to sell the Farm within 5 years for its highest and best price." *Id.* at *3. Upon the anticipated sale of the farm, the agreement provided, Mr. Thornton was entitled to "a minimum of ten [percent] (10%) of the net closing proceeds from the sale of the Farm no matter what the sale price is, provided that the Lease is in effect and that Thornton shall not be in default thereunder. Payment shall be made at time of closing." The lease and memorandum of agreement together comprise the full agreement of the parties. *Id.* at *4.

Grandview Farm did not sell within five years, as the parties originally anticipated. Years later, in 2004, Mr. Massey decided to sell the farm. To this end, Mr. Massey retained The Redfield Group to conduct an auction of the property. Mr. Massey advanced $50,000 to The Redfield Group for this purpose.

On June 26, 2004, the farm was sold at auction. For the sale, the property was divided into 40 different tracts. At the auction, the 40 tracts were sold to a total of 11 different groups of purchasers. The purchasers are: (1) Michael Guszak — tract 1; (2) Vernon Jackson and Joseph Densford — tracts 2 & 3; (3) Deborah and Thomas Campbell — tract 4; (4) Wesley and Jennifer Durbin — tract 5; (5) James Fitts — tract 13; (6) M.N. Brown and Jeff Wilkes

— tracts 20-21, 24-33, & 40; (7) Mr. Thornton — tracts 17 & 18; (8) Ralph Nixon, DDS, MS ("Dr. Nixon") — tracts 7-12; (9) Al Batson — tract 14; (10) Tina and Martin Haggard, Jr. — tracts 15 & 16; and (11) Jerry Odle — tracts 6, 22 & 23, 34-39.[1] Mr. Thornton was aware of the auction and, as can be seen by the list of purchasers, was himself the successful bidder on two of the auctioned tracts.

All of the sales contracts provided that the closing would take place within 15 days after the completion of a land survey. Mr. Massey advanced $20,000 to Advantage Land Survey to perform the surveys.

On July 2, 2004, about a week after the sale, two unsuccessful auction bidders for tracts 25 and 26, Reed Jackson and Joe Densford, sent a demand letter to The Redfield Group, Mr. Massey, and closing attorney Neil Harkavy. Mr. Jackson and Mr. Densford claimed in the letter that they were the rightful winning bidders for the two lots. They also filed a complaint with the Tennessee Auctioneer Commission against The Redfield Group, alleging that it improperly ignored their winning bid at the auction.

In addition, on July 29, 2004, Mr. Jackson and Mr. Densford filed a lawsuit in the Shelby County Chancery Court against The Redfield Group, Mr. Massey, and Attorney Harkavy. The lawsuit asked the Chancery Court to declare Mr. Jackson and Mr. Densford the rightful purchasers of Lots 25 and 26. In the course of the ensuing Chancery Court proceedings, it was later determined that, unbeknownst to Mr. Massey, The Redfield Group was not licensed to perform auctions in Tennessee.

In September 2004, Mr. Thornton received a letter by regular mail from Mr. Massey. The letter was dated June 26, 2004, the same date as the auction of the farm. The letter purported to be a "formal notice of cancellation of the Lease Agreement . . . due to [Thornton's] material breach and default of the terms and conditions of the Agreement." In the letter, Mr. Massey stated that the cancellation of the farm lease was "effective immediately as of the date of this notice" and that Mr. Massey was "entitled to immediate possession of the leased premises." Mr. Massey would later claim that the notice letter demonstrated Mr. Massey's belief that, at the time of the auction, the farm lease to Mr. Thornton was no longer in effect.

On September 3, 2004, Mr. Thornton filed the lease and memorandum of agreement with the Hardin County Register for the purpose of protecting his leasehold rights and his right to the 10% commission under the memorandum of agreement. Mr. Thornton would later claim that the filing of these documents with the county register did not affect the auction sales because

---

[1]This information is in accordance with trial Exhibit A, entered into evidence by stipulation of the parties.

the sales contracts all provided that the purchaser would take the property "subject to any . . . leases."

On October 4, 2004, Mr. Thornton filed the instant lawsuit against Mr. Massey in the Hardin County Circuit Court. In his Circuit Court complaint, Mr. Thornton sought a declaratory judgment, injunctive relief, lien *lis pendens*, and damages. He alleged that, as a result of the June 26, 2004 auction, "each such purchaser had entered into a binding Sales Contract" with Mr. Massey. He also asserted that his farm lease was in effect at the time of auction. Therefore, Mr. Thornton claimed, he was entitled to 10% of the net closing proceeds under the terms of the lease and/or memorandum of agreement.

Meanwhile, by September 29, 2004, surveys were completed on Lots 1, 2, 3, and 4, and Attorney Harkavy was preparing settlement statements in anticipation of closing on the sale of those lots. On October 26, 2004, Attorney Harkavy told Mr. Massey that the survey company needed $21,000 more to complete the surveys. Mr. Massey paid the additional $21,000 to Advantage Land Survey for this purpose.

By letter to Attorney Harkavy dated November 1, 2004, one of the purchasers, Jerry Odle, requested a return of his earnest money on the basis that Mr. Massey has breached the sales agreement because the sale had not yet closed. On December 17, 2004, Mr. Odle's earnest money was refunded as requested, and his sales contract was terminated.

By letter dated November 2, 2004, Mr. Thornton's counsel sent a letter to all of the successful bidders at the auction, asserting that Mr. Thornton had an existing lease on Grandview Farm and informing them, "The current lease term runs through October 1, 2005." The letter told the recipients that they would not be permitted to enter the Grandview Farm land parcels they had purchased "at any time without [Mr. Thornton's] permission, otherwise, those persons who choose to do so will be trespassing and subject to prosecution."

Mr. Massey did not agree with Mr. Thornton that the lease was still in effect. On December 6, 2004, Mr. Massey sent his own letter to all of the successful bidders, including Mr. Thornton. In the letter, Mr. Massey indicated that the dispute with Mr. Thornton had raised certain title problems on the Grandview Farm tracts. The letter read:

> I am writing to tell you that I made a mistake and when a person makes a mistake they ought to own up to it. I made a mistake when I trusted the word of my long-time friend, Linus Thornton.
>
> So, I am sorry to have to inform you that I must call off the closings of the auction until I can get the title problem cleared up.

It shouldn't take too long and I will be happy to sell you the parcels that you bid on under the same terms and conditions of which we previously agreed. Since I am taking this action, I don't expect you to close if you don't want to and I would certainly understand. Also, I have asked the closing attorney to send you your money back. If you still want the land when I get the title cleared, I will be happy to sell it to you.

Once again, I am very sorry for this big mess up, but I will get it straightened out and we can all go on.

Mr. Massey sent the letter to Mr. Thornton, as he was one of the successful bidders. However, the letters sent to the bidders other than Mr. Thornton included an additional note: "P.S. Linus Thornton was a successful bidder on two tracts. I will not sell those two tracts or any others to him." Thus, through this correspondence, Mr. Massey informed the auction bidders that he was "call[ing] off the closings," that he did not expect the purchasers to close on the parcels on which they had bid, and that he would be returning the purchasers' earnest money.

In December 2004, Mr. Massey filed an answer to Mr. Thornton's Circuit Court complaint, as well as a counterclaim. In his answer, Mr. Massey asserted that he had exercised his right to terminate the lease on Grandview Farm due to Mr. Thornton's default, that the lease was not in effect at the time of the auction, and that none of the sales contracts on the auctioned parcels closed. In his counterclaim, Mr. Massey alleged Mr. Thornton failed to pay promissory notes due to him, and also that Mr. Thornton tortiously interfered with the sales contracts for Grandview Farm by filing the Circuit Court action seeking injunctive relief and a lien *lis pendens*.

Mr. Thornton filed an answer in the Circuit Court to Mr. Massey's counterclaim. The answer asserted that Mr. Massey's counterclaim based on the promissory notes was barred by the statute of limitations and other theories. Mr. Thornton denied any tortious interference with the sales contracts and denied the allegations of default under the lease.

In January 2005, the Jackson/Densford lawsuit filed in Shelby County Chancery Court was transferred to the Hardin County Chancery Court. On February 4, 2005, Mr. Jackson and Mr. Densford filed a complaint for injunctive relief in the Hardin County Chancery Court against Mr. Massey, asking the chancellor to enjoin Mr. Massey "from closing any sales until the issue of the validity of the sales can be determined by this Court" and asking the chancellor to preserve the *status quo* and "keep any real estate closing transactions from occurring as a result of a disputed and alleged void auction sale of property pending ruling of this Court"

in the first Chancery Court action. They asserted that preservation of the *status quo* on all lots was necessary because each lot was "interdependent on the others in the sense that they share roads and easements and will necessarily share some expenses in the future."

When Mr. Jackson and Mr. Densford filed the complaint for injunctive relief, the Hardin County Chancery Court entered a temporary restraining order ("TRO") and set a hearing. The TRO enjoined Mr. Massey "from concluding or closing any real estate transaction as a result of the disputed auction of properties at Grandview Farms which occurred on June 26, 2004 until further order of said Court to the contrary." The hearing on the TRO, however, was continued at the request of Mr. Massey. The order granting Mr. Massey's motion for a continuance contained an incomplete sentence, stating: "[T]he Temporary [R]estraining Order issued by this court in these matters shall."[2] This was the Chancery Court's last pronouncement on the subject, and Mr. Massey did not reset the matter for a hearing.[3]

On February 2, 2005, two days before the chancellor entered the TRO, Mr. Massey received the completed survey for each buyer. Ostensibly, at that point, Mr. Massey had the documents needed to proceed with the closings on the Grandview Farm sales contracts. The TRO issued two days later temporarily enjoined Mr. Massey from going forward with the closings.

In the ensuing months, some of the purchasers requested rescission and the refund of their earnest money. In a letter dated April 25, 2005, per his conversation with Mr. Massey on that day, purchaser Michael Guszak asked Mr. Massey to terminate his sales contract and refund his earnest money.[4] Similarly, per letter dated May 2, 2005, purchaser Al Batson also asked Mr. Massey to refund his earnest money, thereby canceling his contract. By letter dated June 2, 2005, purchasers Mr. and Mrs. Campbell referred to a letter they received from Mr. Massey dated April 14, 2005, "regarding the legal problems with the sale of Grandview Farm," and so they "contacted Mr. Harkavy as [Mr. Massey] recommended and requested

---

[2]We presume that this sentence likely was intended to address whether the TRO was extended in light of the continuance, but that cannot be determined from the record.

[3]Mr. Massey claims that there was in fact another hearing on the injunction because it was revisited in the hearing on the parties' summary judgment motions. Nonetheless, Mr. Massey did not reset the hearing on the TRO (which he calls a temporary injunction), nor did he ever separately challenge the Chancery Court order that he claims prevented the closing.

[4]Mr. Guszak was the successful bidder on tract 1, for which the survey was completed in September 2004. The closing did not occur before Mr. Guszak requested the return of his earnest money.

the return of [their] earnest money for Lot 4."[5]  Thus, based on Mr. Massey's recommendation and his explanation of all the "legal problems surrounding the sale," these purchasers asked Mr. Massey to cancel their sales contracts.  Mr. Massey obliged.

Some of the purchasers did not ask Mr. Massey to cancel their sales contracts.  On July 5, 2005, Mr. Massey asked Attorney Harkavy to return the escrowed deposits to each purchaser who had not yet requested a refund of the earnest money.  Attorney Harkavy did so on July 19, 2005.  Of these, James Fitts was apparently the only purchaser who cashed his refund check and cancelled his contract at that time.

Other purchasers insisted on specific performance of their sales contracts.  On October 11, 2005, purchasers Mr. and Mrs. Martin Haggard filed a lawsuit in the Hardin County Chancery Court seeking specific performance of their sales contract.   Later, purchaser Donald Wesley Durbin filed another lawsuit in the Hardin County Chancery Court seeking specific performance of his sales contract.  At some point, purchasers M. N. Brown, Jeff Wilkes, and Dr. Ralph Nixon also filed lawsuits in the Hardin County Chancery Court seeking specific performance of their sales contracts. Eventually, all of the related Hardin County Chancery Court lawsuits were consolidated for trial.[6]

Meanwhile, on December 21, 2005, the trial court below conducted the trial in the case *sub judice* regarding Mr. Thornton's claim to 10% of the net closing proceeds of the sale.  At the time of trial, none of the sales contracts arising from the fateful auction had actually closed.  The trial court heard testimony from both Mr. Thornton and Mr. Massey.[7]

At the conclusion of the trial, the trial court issued an oral ruling finding that the lease agreement was in effect in June 2004, when the auction of Grandview Farm occurred, and that Mr. Thornton was entitled to judgment under the lease.  It held, "[Mr.] Massey's defense that the auctioneering company was unlicensed has no effect on this case."  It also held that, by sending the winning bidders his December 6, 2004 letter, Mr. Massey had ratified his intent to sell the parcels.  The trial court awarded Mr. Thornton a judgment in the amount of $136,583.12, representing ten percent of the estimated total bid amount at the auction for the

---

[5]Like Mr. Guszak, the Campbells were the successful bidders on tract 4, for which the survey was completed in September 2004.  The closing did not occur before they requested the return of their earnest money.

[6]One of the cases in the consolidated Chancery Court action is Mr. Massey's claims against The Redfield Group and its principle, Mike Fisher, based on conduct related to the auction.

[7]The trial court also heard brief testimony from Denise Price, Mr. Massey's former assistant.  Her testimony is not pertinent to the issues in this appeal.

sale of all of the farm parcels, plus post-judgment interest under the terms of the lease.[8] The trial court dismissed Mr. Massey's claim based on the promissory notes. Mr. Massey voluntarily dismissed his claim of tortious interference. On June 5, 2006, the trial court entered a written order consistent with its oral ruling. Mr. Massey filed a timely notice of appeal to this Court.[9]

On December 22, 2005, the day after completion of the trial below, Mr. Massey filed a declaratory judgment action against the successful bidders involved in the Hardin County Chancery Court lawsuits. In that lawsuit, he argued that, because the sales contracts on 13 of the 40 tracts had been rescinded, their removal from the overall sale resulted in "balkanized property remaining for sale (a Swiss-cheese shaped parcel for lack of a better term)." He claimed that the rescission on these parcels resulted in lost sales of over $344,000. Mr. Massey argued that, as a result, the sales contracts on the remaining tracts should be declared void because (1) they arose out of an illegal auction conducted by an unlicensed auction company, and (2) it would be unjust to enforce the remaining contracts because the contracts on over one-fourth of the total number of contracts on the farm property had been rescinded.

On May 17, 2007, in the **Thornton I** appeal, this Court issued a decision affirming in part and vacating in part the trial court's decision. The Court first rejected Mr. Massey's argument that the lease automatically expired at the end of five years. **Thornton I**, 2007 WL 1438766, at *4. It further held that the evidence in the record supported the trial court's finding that Mr. Massey did not give Mr. Thornton notice of the termination of the lease until Mr. Thornton took action to obtain his 10% share of the sales proceeds, sometime after the auction. Consequently, the appellate court affirmed the trial court's holding that the lease was still in effect on the date of the auction. **Id.**

In **Thornton I**, Mr. Massey also argued that Mr. Thornton was not entitled to 10% of the sale proceeds for the farm because, as of the date of the trial, the sales contracts had not closed, so "there are no monies from which an award . . . can be extracted." **Id.** In response, Mr. Thornton contended that the reason there were "no monies" from the sale was because Mr. Massey "elected to engage in a course of conduct to ensure that none of the closings under the [s]ales [c]ontracts would ever take place so as to never pay Thornton[.]" **Id.** In its June 2006 ruling, the trial court below did not address this argument; it reasoned that it was

---

[8]This amount was an "estimate" used at trial based on the bids of the successful bidders; it was not based on the purchase price calculated from the actual surveys.

[9]On January 11, 2007, the trial court entered a supplemental order denying Mr. Thornton's claim for punitive damages.

unnecessary to do so because, "if there were any problems in the sale, that essentially [the sale] was ratified in letters to each of these purchasers after this lawsuit was filed that there was further ratification concerning the sale, that [Mr. Massey] intended to sell. . . ." *Id.* The trial court held that, because Mr. Massey originally intended to follow through with the closings on the sales, Mr. Thornton was entitled to a judgment for 10% of the proceeds.

On appeal in *Thornton I*, this Court held that the trial court, in the first instance, should have addressed Mr. Thornton's "purposeful avoidance" argument:

> It is undisputed that the farm was auctioned in parcels in June 2004; that the auction was conducted by the Redfield Group, which held itself out to be qualified and licensed; that all parcels sold; that the total bid amount was $1,365,831.25; and that Mr. Thornton won the bid for two parcels. The parties also do not dispute that the memorandum of agreement provides for payment of "ten [percent] of the net closing proceeds" and that "[p]ayment shall be made at the time of closing," or that the sales did not, in fact, close. Finally, it is undisputed that in July 2004 the Redfield Group was sued in the chancery court by unsuccessful bidders and that, during the course of the action in chancery court, it was discovered that the Redfield Group was not licensed to conduct the auction in Tennessee. Apparently, the chancery court issued an injunction enjoining the sale of at least some of the auctioned parcels.
>
> The trial court made no findings regarding whether, as Mr. Thornton asserts, the failure to close was due to intentional action on Mr. Massey's part. Mr. Massey, on the other hand, contends the temporary restraining order sought and received by Mr. Thornton at the outset of this lawsuit, in addition to the injunction issued by the chancery court, cast a cloud on the title such that closing was impracticable or impossible. Additionally, although the injunction allegedly issued by chancery court was alluded to at trial, the record does not reflect that the matter was resolved in the trial court, and the testimony at trial was that the actions in chancery court had not been resolved when the current matter was heard in December 2005.
>
> Although the trial court found that the unlicensed status of the Redfield Group did not impact Mr. Massey's decision not to go forward with the sale, we are not satisfied that the action initiated by the unsuccessful bidders against the Redfield Group, and the restraining order apparently issued in that action enjoining the sales, did not prevent the closing of the auction sale or cast a cloud on the title such that closing was impracticable. Thus, we cannot say that Mr. Massey has purposefully avoided closing in order to circumvent or nullify the memorandum agreement at issue here. We are compelled to

remand this matter to the trial court, therefore, for further findings with respect to this issue.

*Id.* at \*5. In addition, the appellate court affirmed the trial court's dismissal of Mr. Massey's counterclaims. *Id.* at \*6. Thus, in summary, the Court in **Thornton I** affirmed the trial court's holding that the lease was in effect on the date of the auction and also affirmed the trial court's dismissal of Mr. Massey's counterclaim. The appellate court vacated the $136,583.12 judgment in favor of Mr. Thornton and remanded the case "for further findings regarding whether the failure to close on sales of the auctioned farm parcels resulted from a purposeful act of Mr. Massey, or whether closing was impossible or impracticable in light of the pending litigation in chancery court regarding the propriety of the auction." *Id.* at \*6.

Later, on December 7, 2007, Mr. Massey filed a motion in the trial court to stay the trial court proceedings pending resolution of the related consolidated Chancery Court proceedings. He noted that the consolidated chancery case was scheduled for trial and argued, "Should the hearing . . . proceed, there stands a very real chance that inconsistent verdicts will issue from the two courts involved in adjudicating the issues surrounding the auction of Grandview Farm." Mr. Massey added, "This is especially the case since many of the parties involved in the Chancery Court action are not present before this Court, whereas all parties, including the parties to the instant action, are present before the Chancery Court." On December 19, 2007, the trial court entered an order granting the motion to stay.[10]

On March 5, 2010, the chancellor presiding over the consolidated Chancery Court case entered an order granting partial summary judgment to the successful bidders and ordering specific performance of their sales contracts with Mr. Massey. The successful bidders who were granted specific performance are M. N. Brown and Jeff Wilkes, Mr. and Mrs. Haggard, Dr. Nixon, Mr. Thornton, and Mr. Durbin.[11] In granting partial summary judgment, the Chancery Court "declar[ed] the real estate contracts entered into by James A. Massey/Asset Management Company, LLC with the said successful bidders upon the conclusion of the June 26, 2004 Auction of Grandview Farms valid and enforceable contracts." The Chancery Court held as a matter of law that The Redfield Group's failure to secure a proper license prior to the auction "has no impact on the validity and enforceability of the said real estate contracts . . . ."

_____

[10]The trial court also directed the parties to submit to the trial court periodic progress reports on the status of the Chancery Court proceedings.

[11]According to Mr. Massey, Mr. Jackson and Mr. Densford dismissed their claims to purchase tracts 25 and 26 and rescinded their sales contract for tracts 2 and 3.

On December 23, 2010, in the case *sub judice,* Mr. Thornton filed an application for a temporary restraining order or other injunctive relief. He alleged that Mr. Massey "has elected to proceed with the closings of some or all of the auctioned parcels pursuant to the real estate contracts entered into at the auction." Mr. Thornton asserted that he would suffer immediate and irreparable harm, loss, or damage unless the vacated portion of his damages, $136,583.12 plus interest, were taken from the closing proceeds and deposited with the court.

Some evidence in the record indicates that the closings that took place as a result of the Chancery Court's March 2010 order occurred on August 25, 2011, and that they resulted in sales proceeds totaling $1,091,415.49. Reportedly, approximately 10% of this amount, that is, $109,000, was placed in escrow by the new closing attorney, Gil Parrish.

After **Thornton I** was remanded, the trial court scheduled a hearing for the proceedings on remand for September 5, 2012.

On August 29, 2012, in anticipation of the remand hearing, Mr. Thornton submitted a Remand Brief to the trial court. He argued that the reason that some of the sales contracts had failed to close was because of, among other things, purposeful acts by Mr. Massey. He specified the following alleged purposeful acts: (1) Mr. Massey's December 6, 2004 letters to the bidders "calling off" the closings based on alleged "title problems" caused by Mr. Thornton, (2) his belated reliance, not until January 2005, on the lack of a proper auctioneer license of The Redfield Group as a reason to oppose the closings, (3) his reliance on the February 2005 TRO issued in the related Chancery Court proceedings, despite the fact that the TRO expired as a matter of law after 15 days pursuant to Rule 65.03(5); and (4) his July 2005 letter terminating the remaining sales contracts and refunding the earnest money to all remaining successful bidders. Mr. Thornton argued that the closings were not made impossible or impractical by the pending Chancery Court litigation, since the TRO expired 15 days after it was issued. He also maintained that the lawsuits actually showed that the sales were valid. Finally, Mr. Thornton pointed out that Mr. Massey continued to take action to stymie the sales, even after the trial court held in favor of Mr. Thornton, by filing a collateral action in the Hardin County Chancery Court in December 2005 attacking the validity of the sales. Therefore, Mr. Thornton argued, the sales were held to be valid for the purchasers who persevered, and the bidders who cancelled their contracts did so only because of Mr. Massey's purposeful acts. Since Mr. Massey interfered with otherwise valid contracts, Mr. Thornton argued that he was entitled to his percentage of the full amount of the sale proceeds for all of the farm parcels. In a supplemental reply brief, Mr. Thornton argued that he would also be entitled to post-judgment interest on any award, dating from the date of the trial, December 21, 2005.

On August 30, 2012, Mr. Massey filed a motion to continue the remand hearing and to compel mediation.[12]  On the same day, Mr. Massey filed another motion, this one to submit evidence in the form of testimony at the remand hearing.  In this second motion, Mr. Massey explained that he "may need to give detailed testimony on the reasons behind the failure of the closings."  He attached a "draft affidavit" to the motion that outlined the substance of his proposed testimony, as well as several exhibits.  The draft affidavit asserted that Mr. Massey had little control over whether the closings took place.  It also said that the sales failed to close because Mr. Thornton himself refused to vacate the farm property, thus putting a cloud on the title to the property.  The draft affidavit claimed that Mr. Thornton's actions, coupled with other external impediments such as survey delays, actually prevented closing on the sales.  Mr. Massey's second motion also informed the trial court that, to rebut any proof Mr. Thornton might submit at the remand hearing, Mr. Massey may have to put on proof from third parties such as bidders, surveyors, and other participants in the closing process.  For these reasons, Mr. Massey argued, the trial court should make the remand hearing an evidentiary hearing.

Mr. Massey also filed a response to Mr. Thornton's Remand Brief. His response reiterated that Mr. Massey at all times diligently pursued closing on the sales, but Mr. Thornton's lawsuit and the consolidated Chancery Court lawsuits made closing impractical or impossible.  Mr. Massey claimed that Mr. Thornton was not entitled to any percentage of the sale proceeds, because some of the sales contracts closed and others did not, and Mr. Thornton's commission was dependent on a sale of the *entire* farm.  According to Mr. Massey, the fact that the farm did not sell in its entirety was caused by: (1) the fact that The Redfield Group botched the auction; (2) the surveyor's delay in performing the surveys; (3) the litigation filed by successful and unsuccessful bidders; and (4) Mr. Thornton's refusal to leave the property until June 2006.  Alternatively, Mr. Massey claimed, Mr. Thornton is not entitled to a percentage of the sale proceeds because he failed to perform his duties under the lease and memorandum of agreement, namely, to improve, repair, and maintain the farm and turn it into a 1st class farming, ranching, and recreational operation.

On November 21, 2012, Mr. Massey filed another affidavit detailing the attorney fees and expenses related to the actual sale, including litigation costs and travel expenses related to court hearings.  He argued that the total $983,957.16 in expenses exceeded the sale proceeds, so Mr. Thornton was not entitled to any percentage.  Mr. Massey's second affidavit also asserted that the total value of the parcels that sold but did not close was $386,738.25.

On January 4, 2013, the trial court held the remand hearing.  At the outset, the trial court denied Mr. Massey's motion for an evidentiary hearing. The trial court concluded that it

---

[12]After the remand briefs were filed, the parties tried to mediate the dispute, to no avail.

would make the decision directed on remand based on the remand briefs and the evidence the parties submitted at the December 2005 hearing.[13]  After the parties presented their arguments, the trial court issued an oral ruling.  It found that the sales contracts that did not close failed to do so because of Mr. Massey's purposeful acts.  The trial court indicated that its factual finding was based in part on its decision to credit the testimony of Mr. Thornton over that of Mr. Massey.  The trial court found:

> I observed the people when they testified, I listened to them, and the Court made its rulings based upon the credibility of the witnesses as well as all those documents that were presented to the Court at that time.
> I am constrained to confess that I find that the Defendant's argument at this time is somewhat disingenuous in that they claim that the Plaintiff is entitled to nothing; notwithstanding the fact that this Court found, according to the terms of the agreements, that the Plaintiff, Mr. Thornton, was entitled to ten percent of the proceeds.
> The only matter that was remanded to this Court is to make a determination whether there was — something existed that might have been impractical or impossible for the Defendant to close.
> This Court finds that in this particular case it goes back to the intentional actions of the Defendant; that he had the ability to move these closings forward and out of a sense of trying to defeat the Plaintiff's entitlement to his ten percent commission he took every action that he possibly could to defeat paying this man one red penny.
> The Court feels that this was done with a vindictive spirit, that all of the activities — and based upon the testimony that the Court heard at that time — and I think I even made findings concerning the fact that the — there weren't legal prohibitions, but the Court of Appeals apparently didn't think that the Court had embellished it enough.
>
> . . .
>
> And the Court specifically finds that it's the willful, intentional actions of Mr. Massey, and that it was done with a deliberate attempt to defeat the contract provisions that were entitled to Plaintiff, to his ten percent commission, that essentially has already been affirmed by . . . The Court of Civil Appeals.

---

[13]The trial court did not admit into evidence the documents attached to the parties' remand briefs, but it is apparent from the court's ruling that it considered the arguments in the remand briefs in making its decision.

On March 26, 2013, the trial court entered a written order, attaching the oral ruling and incorporating it by reference. The trial court reiterated that Mr. Massey could have moved the closings forward but chose instead to purposefully defeat the sales in order to avoid paying Mr. Thornton his commission. For this reason, the trial court awarded Mr. Thornton damages in the amount specified in its original judgment, which was based on the estimate of the total sales price relied upon by the parties in the first trial. It also awarded both prejudgment interest and post-judgment interest. The trial court reasoned that Mr. Thornton was "entitled to prejudgment interest as an element of or in the nature of damages in accordance with the principles of equity at a rate not to exceed 10% per annum under Tenn. Code Ann. § 47-14-123, that prejudgment interest in the amount of 10% per annum is awarded on the stipulated amount of $136,583.12 from July 26, 2004 [30 days after the sale], being the closing date scheduled under the sales contracts for the closings of the auctioned farm parcels." The trial court directed post-judgment interest to run from the date of the judgment at the applicable statutory rate.

On April 24, 2013, Mr. Massey filed a timely notice of appeal. On the same day, he filed with the trial court a motion to alter or amend the March 26, 2013 order. The motion to alter or amend argued that an award of prejudgment interest is inappropriate because that element of damages was not included in the previous June 2006 order, and the issue of prejudgment interest was not within the scope of either the appeal or the remand. He further argued that, at the December 2005 trial, the parties did not stipulate the amount of the gross proceeds; the only stipulation was that Exhibit A was an accurate list of winning auction bidders and the lots on which they placed the winning bid. Exhibit A was prepared before the surveys were completed, Mr. Massey pointed out, so the sales contracts state that the purchase price is subject to the actual acreage as determined by the surveys. Mr. Massey argued that the amount of actual proceeds from the August 2011 sale ($979,093) must be used under the plain language of the contract. After deducting $983,957.16 in expenses, he contended, the expenses exceed the sales proceeds, so Mr. Thornton is entitled to no commissions.

On May 17, 2013, the trial court entered an order denying Mr. Massey's motion to alter or amend. Mr. Massey now appeals the trial court's orders entered on March 26 and May 17, 2013.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Mr. Massey raises essentially four issues, which we summarize as follows: (1) whether the trial court abused its discretion in refusing to reopen the proof at the remand hearing; (2) whether the evidence preponderates against the trial court's factual finding that the closings were not made impossible or impracticable by external impediments, but instead the sales failed to close because of Mr. Massey's purposeful acts; (3) whether the trial court

-14-

erred in awarding Mr. Thornton a percentage of the sale proceeds because Mr. Thornton committed the first breach of the parties' agreement by failing to improve the farm to first-class condition, and also because the farm was not sold in its entirety; and (4) in the alternative, even if Mr. Thornton is entitled to some percentage, whether the trial court erred in its award of damages because (a) the award was not based on "net" proceeds, (b) Mr. Thornton should not be awarded prejudgment interest, and (c) the total bid amount, estimated in Exhibit A, was not the subject of a stipulation and was improperly used to calculate the damage award.

In response, Mr. Thornton argues that, to some extent, the Chancery Court order requiring specific performance of some of the sales contracts renders moot the issues in this appeal, because it shows that there was no legal impediment to the closings. Therefore, he contends, the closings must have failed to take place due to Mr. Massey's purposeful acts. He further argues that many of the issues raised by Mr. Massey are beyond the scope of the remand and are barred under the law of the case doctrine.

We note that this Court's opinion in **Thornton I** did not expressly require the trial court to reopen the proof and consider additional evidence on remand. Absent such a directive, the trial court's decision on whether to reopen the proof is discretionary. We reverse a trial court's discretionary decision only if "an injustice has been done" or if the trial court has abused its discretion. **Robinson v. LeCorps**, 83 S.W.3d 718, 725 (Tenn. 2002). An abuse of discretion occurs where the trial court has applied an incorrect legal standard or where its decision is illogical or unreasoned and causes an injustice to the complaining party. **Mercer v. Vanderbilt Univ., Inc.**, 134 S.W.3d 121, 131 (Tenn. 2004).

The trial court's determination that Mr. Massey's purposeful acts resulted in the failure of the sales contracts is a finding of fact. We review findings of fact *de novo* on the record, presuming those findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d). Factual findings based on witness credibility are accorded great weight on appeal, and such factual findings will not be reversed absent clear and convincing evidence to the contrary. **Sullivan v. Sullivan**, 107 S.W.3d 507, 509-10 (Tenn. Ct. App. 2002). Conclusions of law are reviewed *de novo*, with no presumption of correctness. **Id.** at 510.

To some extent, Mr. Thornton relies on the law of the case doctrine. Under the law of the case doctrine, the appellate court's ruling becomes the law of the case, binding on the parties and on the trial court on remand. **State ex rel. Sizemore v. United Physicians Ins. Risk Retention Group**, 56 S.W.3d 557, 566 (Tenn. Ct. App. 2001). In general, the law of the case doctrine prohibits reconsideration of issues actually decided or necessarily decided by implication in a prior appeal in the same case. **State v. Jefferson**, 31 S.W.3d 558, 560-61 (Tenn. 2000); **Memphis Pub. Co. v. Tenn. Petroleum Underground Storage Tank Bd.**, 975

S.W.2d 303, 306 (Tenn. 1998); ***Ladd v. Honda Motor Co., Ltd.***, 939 S.W.2d 83, 90 (Tenn. Ct. App. 1996).  Thus, except in certain limited situations, the trial court cannot revisit an issue decided in a prior appeal in the same case.  ***Memphis Pub. Co.***, 975 S.W.2d at 306. The extent to which the law of the case doctrine precludes relitigation of an issue decided in a prior appeal is a question of law, subject to *de novo* review.

## ANALYSIS

### Scope of Remand

The parties dispute the scope of this Court's instructions to the trial court in ***Thornton I***.  To clarify, our decision in ***Thornton I*** was an appeal of a final order issued by the trial court after a full trial that took place on December 21, 2005.  At the time of trial, none of the sales contracts had closed, and some of the purchasers had accepted a refund of their earnest money and canceled their contracts.  Other purchasers were seeking legal recourse to enforce their contracts.  In connection with Mr. Thornton's claim that he was entitled to 10% of the proceeds from sales that had not yet closed, Mr. Thornton stipulated that he was entitled to 10% of $1,365,831.25,[14] the total based on the purchasers' bids.  The trial court agreed and awarded damages to Mr. Thornton based on that figure.

In the ***Thornton I*** appeal, all of the errors alleged by the parties at that point were presented to this Court.  The appellate court resolved the issues raised on appeal, with one exception. The ***Thornton I*** Court noted, "The trial court made no findings regarding whether, as Mr. Thornton asserts, the failure to close was due to intentional action on Mr. Massey's part." ***Thornton I***, 2007 WL 1438766, at *5.  In light of this omission, the appellate court remanded the case to the trial court "for further findings with respect to this issue."  ***Id.***  In the conclusion of the opinion, the appellate court remanded to the trial court "for further findings regarding whether the failure to close on sales of the auctioned farm parcels resulted from a purposeful act of Mr. Massey, or whether closing was impossible or impracticable in light of the pending litigation in chancery court regarding the propriety of the auction."  ***Id.*** at *6. ***Thornton I*** did not direct the trial court to conduct an evidentiary hearing for this purpose, nor did it sanction retrial of issues that were or could have been brought before the trial court at the trial.

The proceedings in the trial court below were stayed, and years went by.  Meanwhile, Mr. Massey continued to challenge the validity of the sale in the Chancery Court.  Finally, the Chancery Court determined that the sale was indeed valid.  The passage of time and the

---

[14]At the outset of the trial, counsel for Mr. Thornton stated that "ten percent of that amount is what we're stipulating as to the amount claimed to be due [to] Mr. Thornton under the Memorandum of Agreement."

change in circumstances, however, did not alter this Court's limited directive to the trial court below in *Thornton I*, which was to render factual findings on whether the failure to close on the sales at the time of trial was due to Mr. Massey's purposeful actions rather than external circumstances. Again, *Thornton I* neither required nor authorized retrial of issues in this case based on post-trial events.

For these reasons, we must conclude that the substantive issues raised in this appeal that are not directly related to the question that *Thornton I* remanded are outside the scope of the remand. On remand, the only substantive question to be decided by the trial court was whether the contracts failed to close by the time of trial because of Mr. Massey's purposeful acts. Consequently, we decline to address issues raised in this appeal that do not relate to that question.[15] All other issues could have or should have been raised in the first appeal in this case. Accordingly, the trial court's decision, as affirmed by this Court in *Thornton I*, is the law of the case.

### Refusal to Reopen Proof

Mr. Massey first argues that the trial court erred in declining to reopen the proof to allow him to submit evidence relevant to the issue on remand. As the premise for his argument, Mr. Massey says that this Court in *Thornton I* "stated that there was insufficient factual evidence in the Record" on this issue. Therefore, Mr. Massey asserts, the trial court should have reopened the proof to admit additional evidence on whether the failure of the closings were caused by his purposeful acts.

As we have indicated, we do not interpret *Thornton I* as holding that the evidence in the record was insufficient for the trial court to have resolved the issue that was remanded, only that the trial court had not in fact resolved it. The appellate court in *Thornton I* recognized

---

[15]Specifically, we decline to address Mr. Massey's argument regarding the fact that the parties' agreement entitles Mr. Thornton to the "*net* closing proceeds." He argues, "Now that the closings have occurred, we have an accurate and real figure to serve as actual gross closing proceeds," and goes on to list various expenses he incurred after the trial in this cause. But Mr. Massey ignores the fact that we must limit our consideration to issues that were presented at the trial in December 2005. At the time of trial, there had been no closings, so the trial court based Mr. Thornton's damages on the best estimate of the "net closing proceeds" available at that time, which was 10% of the estimates in Exhibit A. Thus, the trial court took into account the language in the parties' agreement and awarded Mr. Thornton a percentage of the "net closing proceeds" based on the information made available to the trial court at the time of the December 2005 trial. In this appeal, we must limit our review to the directive in our remand order in *Thornton I*. Mr. Massey now asks us to consider post-trial facts on expenses he incurred after the December 2005 trial. We decline Mr. Thornton's invitation to go beyond this Court's directive on remand in *Thornton I* and consider post-trial facts.

that the factual issue was disputed, so it directed the trial court to resolve the factual issue in the first instance. Consequently, we find that the trial court acted well within its discretion in refusing to reopen the proof or conduct an evidentiary hearing. The parties had a full and fair opportunity to present their proof at the first trial in December 2005. Therefore, we conclude that the trial court did not abuse its discretion in refusing to reopen the proof.

### Mr. Massey's Purposeful Acts

Mr. Massey next argues that the evidence in the record was insufficient for the trial court to conclude that his purposeful acts prevented the sales contracts from closing. Mr. Massey recites several external impediments to the sale, including: (1) The Redfield Group botched the auction, (2) the surveys were not completed in a timely manner, (3) the letter from Mr. Thornton clouded the title conveyed by the sale or scared purchasers into doubting the validity of the sales contracts, and (4) the Chancery Court's February 2005 TRO scared buyers into doubting the validity of their sales contracts and prompted them to cancel their contracts. Mr. Massey insists that he was at all times "taking affirmative actions to try to make the closings happen," but despite his best efforts, the frightened buyers pulled out. These circumstances were beyond his control, Mr. Massey maintains; the buyers' cancellation of the sales contracts "was the natural outgrowth" of the external circumstances.

We cannot agree that the evidence preponderates against the trial court's finding on this issue. While some evidence in the record could be viewed as indicating that the closings on the sales contracts were complicated by external factors, documentary evidence in the record supports the trial court's finding that Mr. Massey caused some of these complications. Assuming *arguendo* that Mr. Thornton's registration of his lease and letter to purchasers worried the other successful bidders, Mr. Thornton undertook those actions because Mr. Massey refused to acknowledge that Mr. Thornton was entitled to 10% of the sale proceeds for the farm, and even sent a letter to Mr. Thornton in an effort to cancel the lease. Mr. Massey made his position clear in his December 2004 letter to the purchasers; he lamented that he was forced to "call off the closings" until he could "get the title problem cleared up." In the ensuing months, letters from purchasers who requested their earnest money back implied that their requests were based on conversations with Mr. Massey in which he recommended that they do so. The letters indicate that Mr. Massey personally called purchasers to make them aware of the alleged "title problems" and to recommend that they cancel their contracts, all while assuring purchasers that they (but not Mr. Thornton) could re-purchase the property after the title problems were "cleared up" — *i.e.*, when Mr. Thornton's lease was no longer in effect.

Mr. Massey makes much of the fact that the surveys were not completed until February 2, 2005, and that two days after that, on February 4, 2005, the Chancery Court issued its TRO.

-18-

After issuance of the TRO, Mr. Massey claims, he was "powerless" to close on the sales contracts because the TRO prohibited it, and pursuing the closings in the face of the TRO would not have been prudent.

Respectfully, from our review of the record, there is sufficient evidence to support the trial court's finding that the delayed surveys and the TRO were tangential to the failure of the closings to take place, and that Mr. Massey's purposeful actions were the primary reason the sales did not close. As the person against whom the TRO was issued, Mr. Massey could have asked the Chancery Court to dissolve the injunction. Instead, he obtained a continuance of the original hearing on the TRO and then did not reschedule another hearing. Mr. Massey effectively chose not to challenge the TRO and then relied upon it to convince the remaining successful bidders that the Chancery Court had prohibited him from closing on the sales. Moreover, in July 2005, Mr. Massey made the unilateral decision to return the earnest money to purchasers who had not yet taken him up on his offer to cancel their sales contract. After the trial, Mr. Massey even went so far as to file a declaratory judgment action asking the Chancery Court to declare the sales contracts void. Thus, there is substantial evidence in the record to support the trial court's factual finding on remand that Mr. Massey engaged in purposeful acts designed to prevent closing on the sales contracts to the farm property.

The opinion in *Thornton I* indicated that the record at that point was unclear as to whether the Chancery Court actions and the Chancery Court TRO might have made it impractical for Mr. Massey to go ahead with the closings or may have even outright prevented the closings. The record before us in this appeal supports a finding that Mr. Massey chose not to ask the chancellor to dissolve the TRO and used the TRO to convince successful bidders to cancel their contracts. Moreover, the record in this second appeal shows that the Chancery Court ordered specific performance of the remaining contracts and upheld the validity of the sales contracts. Therefore, it is apparent that the Chancery Court proceedings did not make the closing "impossible or impracticable," as suggested by Mr. Massey.

From our careful review, a preponderance of the evidence in the record supports the trial court's factual finding that, at the time that this case was tried in December 21, 2005, the sales contracts on the farm property had not closed because of Mr. Massey's purposeful acts, and the closings were not made impossible or impracticable by the Chancery Court litigation.

### Prejudgment Interest

Mr. Massey argues that the trial court erred in making a *sua sponte* award of prejudgment interest to Mr. Thornton as an element of damages. He contends that this award was made in error because (1) prejudgment interest was not awarded in the trial court's June 2006 order on appeal in *Thornton I*, so the award is outside the scope of this Court's remand, and (2)

Mr. Thornton did not request prejudgment interest at any time during the trial or on remand. He asserts, "Only in the final seconds of the remand hearing did the Court order pre-judgment interest *sua sponte*." In response, Mr. Thornton argues that the trial court's award of prejudgment interest was well within its discretion and appropriate to fully compensate him for the loss of the use of the monies to which he was entitled.

Tennessee Code Annotated § 47-14-123 provides: "Prejudgment interest, *i.e.*, interest as an element of, or in the nature of, damages . . . may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." This Court has observed that "our courts have repeatedly recognized that prejudgment interest is awarded, not to punish the wrong-doer, but to compensate the wronged party for the loss of the use of the money it should have received earlier." *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 82 (Tenn. Ct. App. 2000). The Tennessee Supreme Court has explained that an award of prejudgment interest is discretionary with the trial court:

> An award of prejudgment interest is within the sound discretion of the trial court and the decision will not be disturbed by an appellate court unless the record reveals a manifest and palpable abuse of discretion. This standard of review clearly vests the trial court with considerable deference in the prejudgment interest decision. Generally stated, the abuse of discretion standard does not authorize an appellate court to merely substitute its judgment for that of the trial court. Thus, in cases where the evidence supports the trial court's decision, no abuse of discretion is found.

*Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998) (citations omitted).

In *Myint*, the Supreme Court observed that courts at that time had generally seen prejudgment interest as available only under limited circumstances; they typically denied requests for prejudgment interest when the amount of the underlying obligation was uncertain or when the underlying obligation was disputed on reasonable grounds. The *Myint* Court articulated broader circumstances under which prejudgment interest may be awarded, describing a flexible approach based on fairness:

> Simply stated, the court must decide whether the award of pre-judgment interest is fair, given the particular circumstances of the case. In reaching an equitable decision, a court must keep in mind that the purpose of awarding the interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize the defendant for wrongdoing.

***Myint***, 970 S.W.2d at 927, ***quoted in Scholz***, 40 S.W.3d at 83. In the wake of ***Myint***, this Court has held that an award of prejudgment interest is favored when such an award "will more fully compensate plaintiffs for the loss of use of their funds. Fairness will, in almost all cases, require that a successful plaintiff be fully compensated by the defendant for all losses caused by the defendant, including the loss of use of money the plaintiff should have received." ***Scholz***, 40 S.W.3d at 83.

We conclude that the trial court below did not abuse its discretion in determining that the equities in this case support an award of prejudgment interest. We agree with Mr. Massey that an award of prejudgment interest without a specific request for it is atypical, but the lack of a specific request for prejudgment interest does not preclude such an award. "[P]re-judgment interest does not have to be demanded in the complaint to be awarded."[16] ***Story v. Lanier***, 166 S.W.3d 167, 181 (Tenn. Ct. App. 2004) (quoting ***York v. Vulcan Materials Co.***, 63 S.W.3d 384, 390 (Tenn. Ct. App. 2001)). Moreover, Mr. Thornton's right to the percentage of the sale proceeds arose out of the sales contracts. In light of the complicated litigation, he was deprived of those funds for almost ten years. Under all of these circumstances, we do not agree with Mr. Massey's contention that the trial court's award of prejudgment interest was intended to punish Mr. Massey.

Mr. Massey correctly notes that the trial court did not award prejudgment interest in the June 2006 order, and that ***Thornton I*** did not direct the trial court to consider an award of prejudgment interest on remand. However, prejudgment interest is intended to compensate a plaintiff for the pecuniary cost associated with the passage of time, which was exacerbated by the first appeal and the remand. Considering all of the circumstances in this case, we cannot conclude that the trial court abused its discretion in making its award. Therefore, we affirm the trial court's award of prejudgment interest to Mr. Thornton.

CONCLUSION

In sum, we affirm the trial court's decision to deny Mr. Massey's request for an evidentiary hearing on remand. We affirm the trial court's factual finding that the closings on the sales contracts did not take place because of Mr. Massey's purposeful acts, and that the sales were not made impossible or impracticable by the Chancery Court proceedings. In addition, we find that the trial court did not abuse its discretion in awarding prejudgment interest to Mr. Thornton to compensate him for the loss of the use of his money. All other issues raised but not addressed herein are either pretermitted or they are outside the scope of our remand in ***Thornton I***.

---

[16]Although Mr. Thornton did not request prejudgment interest, he asked that the award of post-judgment interest be made retroactive to the date of trial, December 21, 2005; this request was not granted.

-21-

The decision of the trial court is affirmed.  Costs on appeal are to be taxed to James A. Massey and his surety, for which execution may issue if necessary.


_____

HOLLY M. KIRBY, JUDGE