IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 7, 2016 Session

**STATE OF TENNESSEE v. TABITHA GENTRY, AKA ABKA RE BAY**

**Appeal from the Criminal Court for Shelby County**
**No. 13-02671          James M. Lammey, Jr., Judge**
_____

**No. W2015-01745-CCA-R3-CD  -  Filed August 12, 2016**
_____

A Shelby County jury convicted the Defendant, Tabitha Gentry, aka Abka Re Bay, of theft of property valued over $250,000 and aggravated burglary. The trial court ordered an effective sentence of twenty years in the Tennessee Department of Correction, to be served consecutively to a prior sentence from another Shelby County conviction. The Defendant appeals contending that: (1) the evidence is insufficient to support her convictions, (2) the trial court improperly limited cross-examination of a State witness about adverse possession; (3) the trial court improperly limited the Defendant's closing argument; and (4) consecutive sentencing was inappropriate in this case. After review, we remand the case for resentencing and affirm the trial court's judgments in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed in Part, Reversed in Part, and Remanded for Resentencing**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Tabitha Gentry, aka Abka Re Bay.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; Byron Winsett and Samuel D. Winnig, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
**I.  Facts**

## A. Trial Evidence

This case arises from the unauthorized breaking into and entering of a Shelby County residence. For her role in these events, a Shelby County grand jury indicted the Defendant for theft of property valued over $250,000 and aggravated burglary. At a trial on these charges, the parties presented the following evidence: Jon Dickens, a Marx-Bensdorf Realtors agent, testified that he began his involvement with the sale of the Shelby County residence at issue in June or July 2012. Mr. Dickens, Renasant Bank's agent, listed the property after Renasant Bank became the owner through foreclosure. At the time of this incident, March 2013, there was a contract for the sale of the residence. Mr. Dickens identified the location of the residence on several aerial view maps of the property. The property, a multi-million dollar gated estate, was in excess of three and a half acres. The residence was more than ten thousand square feet with a four-car garage and a swimming pool.

Mr. Dickens drove by the property on March 4, 2013, and noticed signs and chains on the gate. He identified a photograph of a sign that had been on the gate with the writing, "Moorish National Republic," and another with the writing, "I, Abka ReBay, seize this land." Mr. Dickens stated that, as the bank's agent, he had authority to enter the premises in his capacity as a real estate agent. His inability to access the property due to the chains concerned him, so he contacted his representative at Renasant Bank, Greg Paule. Mr. Paule met Mr. Dickens at the residence and surveyed the signs and chains on the gate. While there, the two men saw people "running around" inside the residence. They also saw children running on the front patio. Mr. Dickens also observed a "young lady" walk to the front of the property and when she saw the two men, run back to the residence.

Mr. Dickens contacted law enforcement about the issue and was advised to post a formal notice to vacate the property on the gate. Mr. Dickens identified the formal notice on Renasant Bank letterhead that he posted on the gate of the residence. The notice read:

> March 5, 2013, 2:30 p.m.
> This is your formal notice to vacate this property [ ] within twenty-four hours from the date and time above. You must have vacated this property by March 6th, 2013, at 2:30 p.m.

Mr. Dickens confirmed that, other than what he had read on the signs posted on the front gate, he was unaware of who was occupying the residence. He further confirmed that no one had permission to be on the property at that time.

2

On cross-examination, Mr. Dickens testified that, as a real estate broker, he was familiar with the legal term adverse possession. He agreed that to adversely possess property, the possession must be hostile, actual, exclusive, open and notorious, and continuous. Mr. Dickens agreed the signage was in the "open" and the Defendant excluded Mr. Dickens from the property. He confirmed that the sale price of the residence was 2.4 million dollars.

Mr. Dickens said that the residence was unfurnished at the time the Defendant was in the residence. Mr. Dickens said that he regularly checked on vacant residences due to concern over possible vandalism. He guessed that the Defendant had been in the residence a "couple days" before he observed the chains and signs on the gate. Mr. Dickens checked the property for damage after the Defendant was removed and found mattresses, blankets, clothes, and food. Mr. Dickens could not remember specifically but said he observed "some damage" to the residence that required repair. He said that the front door required repair because "the house was broken into."

On redirect examination, Mr. Dickens testified that, during the course of this incident, he saw a white car entering and exiting the property on at least one occasion. He stated that the property was maintained by a pool company and a lawn care company. Mr. Dickens agreed that the residence, although empty, had not been abandoned. Mr. Dickens stated that he believed that adverse possession was not a defense to theft.

During recross examination, defense counsel began questioning Mr. Dickens once again about adverse possession, and the State objected. A bench conference was held, and the trial court concluded that questions of law were to be determined by the court and not by Mr. Dickens. The trial court found that defense counsel's cross-examination had "opened the door" to the questions on redirect about adverse possession but no further questioning about adverse possession with this witness would be allowed. The trial court noted that Mr. Dickens had no "real expertise" in the area of adverse possession and that the possibility existed of confusing the jury on a complex civil legal issue. The trial court stated that it would advise the jury to follow the law as instructed by the trial court at the end of the trial. The trial court did, however, allow defense counsel to ask whether Mr. Dickens actually knew whether adverse possession was a defense to theft, and Mr. Dickens responded that he did not know for certain.

Gregory Allen Hadaway, Executive Vice President of Renasant Bank, testified that the residence at issue was a piece of property that, at one time, secured a loan that Renasant Bank made to an individual. The individual failed to pay, and Renasant Bank foreclosed upon the property and became the owner. The property was a "ten-thousand-square-foot house, three-plus acres, very nicely finished inside, very expensively landscaped, [with] an eighty-thousand watt standby generator." This property was

3

located in an area with "similar-sized properties." Mr. Hadaway identified the warranty deed for the property with the recorder's number indicating the deed had been filed in the Shelby County Register's Office. Next, he identified the substitute trustee's deed passing title to Renasant Bank on August 26, 2011. Mr. Hadaway confirmed that he had never given the Defendant permission to be on the property at issue or inside the residence.

Greg Paule testified that in 2012 he worked at Renasant Bank as a real estate sales officer. In this role, Mr. Paule worked with properties acquired through foreclosure to try and sell the properties. One of the properties Mr. Paule worked with was the residence at issue in this case. At the end of 2012, Mr. Dickens, as the real estate agent for the property, negotiated a sale between Mr. Paule, as an agent of the bank, and a buyer for the sale of the house for 2.4 million dollars. Mr. Paule identified the settlement statement associated with this sale. The closing date for the sale of the house was March 29, 2013.

Originally, the closing date was set for a day in February 2013. Due to the results of a home inspection the closing date was delayed until March to allow the bank to make necessary repairs as identified in the inspection report. During this period of time, the instant offenses occurred. Mr. Paule recalled that Mr. Dickens notified him on March 4, 2013, that the gates to the residence were chained and that Mr. Dickens was unable to enter the residence. After speaking with Mr. Dickens, Mr. Paule alerted his superior of the situation and then contacted the police. Mr. Paule drove to the property where Mr. Dickens was waiting for him and surveyed the chains and signage posted to the front gate. Mr. Paule stated that he had not given permission, through his authority at the bank, to anyone to chain the front gate. Mr. Paule identified a photograph of one of the posted signs that read, "I Abka ReBay, seize this land." Mr. Paule did not know of an "Abka ReBay" or a "Tabitha Gentry" at that time. He confirmed that he had not given the Defendant authority or permission to enter the residence.

Mr. Paule and Mr. Dickens remained at the residence on March 4, waiting for the police to arrive. As they waited, a black female walked down toward the gate. As she approached something startled her and she ran back to the house. As the young woman ran back, Mr. Paule saw another person standing at the window of the house "yelling something . . . unintelligible." A few minutes later, two children came out on the front patio, danced around, and then "jumped back in the house." When the police officers arrived, they took statements from Mr. Paule and Mr. Dickens, photographed the front gate, and instructed Mr. Paule to contact the police department the following morning. The following day, upon advice from police officers, Mr. Paule posted a notice to vacate on the property. Mr. Paule attached the notice with a plastic tag and covered the notice with plastic to protect the document from any inclement weather. On March 7, 2013, Mr. Paule met with Shelby County Sheriff's deputies and had access to the residence again on March 8, 2013. Upon re-entry, Mr. Paule found that the front screen door and frame of

4

the front door were both damaged. A sliding bolt lock had also been installed on the front door. There were minor scuff marks inside the residence requiring paint; however, the most costly damage was the missing realtor box containing the house key. As a result, the bank had to have the residence rekeyed.

Stephen Branim, a Shelby County Assessor of Property appraiser, testified that the residence at issue appraised for three million dollars in 2013 and that was the same amount that remained the certified value of the property for the years 2014 and 2015. Mr. Branim agreed that a sale value and an appraisal value may be different.

William Brantley, a Shelby County Sheriff's Office deputy, testified that he was a member of the Special Weapons and Tactics ("SWAT") team. Deputy Brantley recalled assisting the Fugitive Unit in serving an arrest warrant on March 7, 2013, at the residence. Members of the SWAT team approached the residence from the rear and observed a white vehicle pull out of the garage. A juvenile female shut the garage door manually and then got into the vehicle, driving down the driveway to the front gate. Deputy Brantley notified other officers of the vehicle and its direction of travel.

A short time later, the SWAT team entered and cleared the residence. There were no other people in the house at that time. Deputy Brantley said that Mr. Dickens had provided law authorities with a key to the residence but that the locks to the residence had been changed. Ultimately, the SWAT team gained entry by ramming a rear door of the residence.

Richard Almond, III, a Shelby County Sheriff's Office sergeant, testified that he is assigned to the fugitive squad and was involved in the Defendant's arrest. Sergeant Almond conducted a traffic stop of the white vehicle shortly after it left the residence. The vehicle contained an adult female and two juvenile females. The driver of the vehicle identified herself as "Tabitha." Sergeant Almond had an arrest warrant for the Defendant so he took her into custody. As he put her in his vehicle, she told him her name was "Abka." Sergeant Almond located the Defendant's identification, a Mississippi driver's license, in her purse. The driver's license identified the Defendant as "Tabitha Gentry."

Brad Less, A Shelby County Sheriff's Office sergeant, testified that his initial involvement in this case arose through service of custody papers and active warrants. The arrest warrant related to the Defendant and the search warrant was for the residence at issue. Sergeant Less, among others, executed the search warrant on March 7, 2013, after SWAT members removed the chain from the front gate. The SWAT team cleared the residence, and then Sergeant Less entered the residence.

5

Sergeant Less identified photographs of items he observed at the residence including the signs found on the front gate and a photo I.D. The identification card was a Moorish National identification card for Abka Re Bay with the address "55 South Third Street, Memphis, Tennessee, Republic, 38101," a different address than for the property at issue. Sergeant Less noted that neither the State of Tennessee nor the State of Mississippi issued identification cards like the one found in the residence. Throughout the residence, Sergeant Less observed various items used to secure rooms such as bungee cords or belts. On a shelf in one of the rooms, officers found various identification cards for "Abka ReBay." Also found was a "benefit security card," and two "Green Dot Visa Debit Card[s]," in the name of Tabitha Gentry. Sergeant Less identified a March 4, 2013 Home Depot receipt found inside the residence for the purchase of six signs displaying various phrases for indicating "Private Property, no trespassing."

## B. Jury Instructions, Verdict, and Sentencing

During the jury instruction, the trial court charged the jury on the defense of claim of right as follows:

> Affirmative defense, claim of right:
>
> Included in the defendant's plea of not guilty is her defense of claim of right. It is a defense to prosecution of this offense if:
>
> (1) That the defendant acted under an honest claim of right to the property involved.
>
> Or (2), that the defendant acted in the honest belief that she had the right to obtain or exercise control over the property that she did.
>
> Or (3), that the defendant obtained or exercised control over the property while honestly believing that the owner, if present would have consented.

The parties then gave closing arguments, during which defense counsel raised the issue of adverse possession, and the State objected. The trial court instructed defense counsel that he could argue the jury instruction on claim of right. Defense counsel explained that, through the testimony of Mr. Dickens, he wanted to argue that "it could be" the Defendant's "honest belief" that she "was going to get adverse possession of it." The trial court prohibited any argument as to adverse possession because it was a civil legal doctrine, which might confuse the jury, and because the Defendant had not testified about

6

her beliefs; therefore, "there is nothing in the record that shows that she knew anything about adverse possession."

After hearing this evidence, the jury convicted the Defendant of theft of property valued over $250,000 and aggravated burglary. At a subsequent sentencing hearing, the State argued in favor of consecutive sentencing based upon offenses committed in October 2012. The Defendant was released on bond and failed to appear for a court hearing on November 9, 2012. As a result, the State entered a nolle prosequi as to the charges and sought a direct indictment. The trial court sentenced the Defendant to concurrent sentences of twenty years for the theft conviction and three years for the aggravated burglary conviction. The trial court considered consecutive sentencing and ordered these sentences to be served consecutively to her sentence in Shelby County case number 13-01547. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that: (1) the evidence is insufficient to support her convictions, (2) the trial court improperly limited cross-examination of a State witness about adverse possession; (3) the trial court improperly limited the Defendant's closing argument; and (4) consecutive sentencing was inappropriate in this case.

## A. Sufficiency of the Evidence

The Defendant asserts that the State's evidence is insufficient to sustain her convictions because the State failed to show that she "intended to permanently deprive Renasant Bank" of its property. She contends that "property," as used in the theft statute, excludes real estate. The State responds that the evidence is sufficient to sustain the convictions. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be

7

drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn. 1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

A person commits theft of property if that person: (1) "knowingly obtains or exercises control over the property," (2) "with intent to deprive the owner" of the

property, and (3) "without the owner's effective consent." T.C.A. § 39-14-103 (2010). In addition to these three elements, the fact-finder must also determine the classification of the theft, based on the value of the property stolen. Theft of property valued at more than $250,000 is a Class A felony. T.C.A. § 39-14-105(6) (2010). For several days in March 2013, the Defendant exercised exclusive control over Renasant Bank's residential property in Shelby County, Tennessee. She entered the property without permission, barred the entry of the lawful owner, and placed signage around the property indicating her intent to deprive the rightful owner of the property. At the end of March 2013, the property sold for 2.4 million dollars and had been appraised in 2013 at a value of three million dollars. These facts support a conviction for theft of property valued over $250,000.

Aggravated burglary is when a person enters, without the consent of the owner, a habitation and commits a felony. T.C.A. §§ 39-14-403, -402 (2010). A habitation is "any structure . . . which is designed or adapted for the overnight accommodation of persons." T.C.A. § 39-14-401 (2010). The Defendant broke into the front door of the residential home owned by Renasant Bank with the intent to commit a theft of the home. She added locks to the residence and chained the front gate to prevent the legal owner's entry. The Defendant had no permission or authority to enter the property. These facts support a conviction for aggravated burglary.

As to the Defendant's contention that property, as used in the theft statute, excludes real property, she offers no law in support of this theory, and the plain reading of the statute indicates no intent on the part of the legislature to exclude real property from the theft statute. The Defendant also appears to complain about the remedy sought by the lawful owner of the property and the specific offenses for which the State elected to pursue suggesting alternative offenses with which she might have been better charged. The district attorney, however, "has virtually unbridled discretion in determining whether to prosecute and for what offense." *Dearborne v. State*, 575 S.W.2d 259, 262 (Tenn. 1978) (quoting *Pace v. State*, 566 S.W.2d 861, 867 (Tenn. 1978) (Henry, C.J., concurring)); *see also State v. Harris*, 33 S.W.3d 767, 771 (Tenn. 2000) ("'[S]o long as the prosecutor has probable cause to believe that the accused committed an offense . . . , the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely within his discretion.'" (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)). Our review of the record reveals that there was sufficient evidence, beyond a reasonable doubt, to support the Defendant's convictions for theft of property valued over $250,000 and aggravated burglary.

### B. Cross Examination

The Defendant asserts that the trial court erred when it limited defense counsel's cross-examination of a witness about the legal doctrine of adverse possession. The State responds that the trial court properly exercised its discretion in limiting cross-examination and closing argument to the law as instructed to the jury and to exclude cross-examination and argument that might confuse the jury. We agree with the State.

A defendant's constitutional right to confront the witnesses against him includes the right to conduct meaningful cross-examination. *State v. Wyrick*, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001). Denial of a defendant's right to effective cross-examination is "'constitutional error of the first magnitude'" and may violate the defendant's right to a fair trial. *State v. Hill*, 598 S.W.2d 815, 819 (Tenn. Crim. App. 1980) (quoting *Davis v. Alaska*, 415 U.S. 308, 318, (1974)). "The propriety, scope, manner and control of the cross-examination of witnesses, however, rests within the sound discretion of the trial court." *State v. Dishman*, 915 S.W.2d 458, 463 (Tenn. Crim. App. 1995); *Coffee v. State*, 216 S.W.2d 702, 703 (Tenn. 1948). Furthermore, "a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation." *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994).

The defendant's right to cross-examine a witness is also limited to questions that are designed to elicit relevant evidence. Under Rule 401, "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. Rule Evid. 401. Rule 402 states, "All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." Tenn. Rule Evid. 402. Finally, Rule 403 states, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. Rule Evid. 403. "The decision regarding the admissibility of [evidence] pursuant to these Rules lies within the sound discretion of the trial court and will not be overturned on appeal absent a clear showing of an abuse of that discretion." *State v. Young*, 196 S.W.3d 85, 105 (Tenn. 2006) (citing *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978)).

We conclude that the Defendant has not shown a clear abuse of discretion on the part of the trial court. There was no evidence presented about the Defendant's beliefs regarding her occupation of a residence she did not own. The issue of adverse possession arose at trial during the cross-examination of Mr. Dickens, a lay witness for the State.

10

Although the witness had some knowledge of real estate law, he was not qualified as an expert witness. We first note that the jury instructions are the "sole source of the legal principles," to be considered by the jury. *Travis Goodman v. Kathy Jones,* No. E2006-02678-COA-R3-CV, 2009 WL 103504 at * 5 (Tenn. Ct. App. Jan. 12, 2009) (quoting *Ladd v. Honda Motor Co., Ltd.*, 939 S.W.2d 83, 94 (Tenn. Ct. App. 1996). Further, to subject a "lay" witness, whose testimony by definition is based only upon facts observed, not upon opinions or inferences, to cross-examination about the legal doctrine of adverse possession and its ramifications in the same fashion an expert is subjected to cross-examination would be improper. *See* NEIL P. COHEN, ET AL., TENNESSEE LAW OF EVIDENCE, § 7 .01[4][a]. While the trial court afforded Defendant's counsel some latitude in cross-examining the lay witness, we agree with the trial court that further cross-examination on the doctrine of adverse possession, a method of acquiring title to real property by possession, could confuse the issues and mislead the jury.

Accordingly, we conclude that the trial court did not abuse its discretion by limiting the cross-examination of Mr. Dickens.

### C. Closing Argument

The Defendant argues that the trial court abused its discretion when it excluded any discussion of adverse possession from closing argument. The State responds that the trial court properly limited closing argument to the law instructed by the trial court. We agree with the State.

The Tennessee Supreme Court "has long recognized that closing arguments are a valuable privilege that should not be unduly restricted." *Terry v. State*, 46 S.W.3d 147, 156 (Tenn. 2001) (citing *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). "Consequently, attorneys are given greater leeway in arguing their positions before the jury, and the trial court has significant discretion in controlling these arguments, to be reversed only upon a showing of an abuse of that discretion." *Terry*, 46 S.W.3d at 156 (citing *Sutton*, 562 S.W.2d at 823); *see Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). This Court has explained that "closing arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *See State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003) (citing *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995)).

As discussed above, the legal doctrine of adverse possession was not a legal issue properly raised before the jury and, therefore, was not included in the trial court's jury instructions. The trial court instructed the jury about the "claim of right" defense and also reminded defense counsel of the option to argue this defense. While defense counsel elicited some information about adverse possession from Mr. Dickens, this testimony

alone was not sufficient to allow the issue to be raised in closing argument. Therefore, the trial court did not abuse its discretion in limiting closing argument to the law as instructed to the jury and the facts and evidence presented at trial.

## D. Sentencing

The Defendant contends, and the State agrees, that the trial court erred by imposing consecutive sentences based on the Defendant's being on bail when the present offenses were committed. According to the record before us, the State had dismissed the October 2012 charges, for which the Defendant had been on bond, in November 2012 and she was, thereafter, arrested for these offenses in March 2013.

Tennessee Code Annotated section 40-20-111(b) provides that a trial court must order sentences to run consecutively if a defendant commits a felony while released from jail on bond and is convicted of both offenses. In this case, the Defendant was arrested in October 2012 for aggravated assault and intentionally evading arrest in an automobile. According to the record, the Defendant failed to appear for a hearing in November 2012, and the State entered a nolle prosequi as to those October charges. Although, the Defendant was later indicted for the October offenses and convicted at trial, she was not released from jail on bond for the October offenses at the time she committed the offenses that are the subject of this appeal. Therefore, there is no basis for mandatory consecutive sentencing in this case. Further, the State concedes that there is no discretionary basis pursuant to Tennessee Code Annotated section 40-35-115, for ordering consecutive sentences in this case. Likewise, our review of the record does not reveal a discretionary basis for consecutive sentencing.

Accordingly, we conclude that the record demonstrates that consecutive sentencing was not appropriate in this case, and we remand the case for resentencing.

## III. Conclusion

In accordance with the aforementioned reasoning and authorities, we remand for resentencing consistent with this opinion, and we affirm the trial court's judgments in all other respects.

_____
ROBERT W. WEDEMEYER, JUDGE

12